Per Curiam:
This case was referred to Trial Commissioner Franklin M. Stone with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on April 20, 1965. On June 28, 1965, defendant filed a motion for an order dismissing that part of plaintiff’s claim occurring subsequent to September 4,1955, and on August 9,1965, the court entered an order that action as to said motion be held pending consideration by the court of defendant’s brief and exceptions as to the remainder of the plaintiff’s claim. *693 Exceptions were filed by the defendant and the case was submitted on defendant’s oral argument and brief. Plaintiff’s motion for leave to file a brief in lieu of oral argument was allowed. Since the court is in agreement with the opinion and recommendation of the commissioner, with a modification, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Therefore, plaintiff is not entitled to recover on that part of his claim pertaining to the period subsequent to September 4, 1955, and defendant’s motion filed June 28, 1965, is granted and the petition is dismissed to that extent. Plaintiff is entitled to recover on that part of his monetary claim for accrued basic pay, including flying pay and allowances, to which he would have been entitled during the period from May 4, 1955 to September 4,1955, inclusive, less any proper set-offs that defendant may have; and judgment is entered to that effect with the case remanded to the trial commissioner under Rule 47 (c) for further proceedings consistent with this opinion.
Commissioner Stone’s opinion,* as modified by the court, is as follows:
On August 5,1954, plaintiff, who was then a first lieutenant in the United States Army Reserve Corps, accepted an appointment as a second lieutenant in the District of Columbia Air National Guard by reason of which appointment he was discharged from the Reserve Corps on December 30, 1954. Plaintiff was promoted to first lieutenant in said National Guard unit on March 19, 1955. Pursuant to orders issued by the Headquarters of the Guard on January 24,1955, plaintiff entered on active duty on March 20, 1955, and reported at Graham Air Force Base (AFB), Marianna, Florida, on March 22, 1955, for the purpose of undergoing jet pilot training in grade, in Class 56-K. Those orders provided, mter alia, that the duration of plaintiff’s training course would be approximately 16 months “unless sooner terminated or graduated” and that upon completion of the *694 course, “unless sooner released by proper authority,” plaintiff would be returned to his home.
On April 21,1955, plaintiff failed to obtain a satisfactory rating on a progress check flight given by an Air Force check pilot who recommended that plaintiff be eliminated from the flying training program.
On April 25, 1955, plaintiff was notified, in writing, to appear before a faculty board (hereinafter referred to as the “Graham Faculty Board” or the “Graham Board”) which would convene on April 26,1955, for the purpose of determining whether or not plaintiff should be eliminated from the pilot training program because of “Flying Deficiency.” On April 26, 1955, the Graham Board met, held a hearing, and recommended that plaintiff be eliminated from further pilot training because of flying deficiency; however, the Board also recommended that plaintiff be given “further aircrew training”. On May 3, 1955, the findings and recommendations of the Board were approved by a rated, regular Air Force officer who was both the convening authority and the reviewing authority. Orders were issued on May 4, 1955, directing plaintiff to return to his home of record in Washington, D.C., and he was released from active duty on or about May 7,1955.
It appears that subsequent to his release from pilot training, plaintiff established residence in the State of Virginia, resigned his commission with the District of Columbia National Guard, and on June 14,1955, he received a commission as a first lieutenant from the Virginia Air National Guard. Thereafter, pursuant to orders issued on August 23,1955, by the Virginia Air National Guard, plaintiff entered on active duty September 5,1955, and reported at Ellington Air Force Base (AFB), Houston, Texas, on September 8,1955, for the purpose of attending the “Observer Training — In Grade Class 56-14C.” Those orders were similar to the ones issued by the District of Columbia Air National Guard, mentioned sufra, and they provided, inter alia, that plaintiff’s active duty training would be for one year or more and that upon completion of the course, “unless sooner relieved”, he was to return to his home of record.
*695 On or about September 9, 1955, plaintiff commenced observer (aircrew) training in Class 56-14C, that led to the aeronautical rating of Aircraft Observer. He was placed on a student flight status and started drawing pay for flying on or about September 15, 1955. Plaintiff flew twelve missions, six of which were unsatisfactory. He also had difficulty with certain academic studies, and as a result of failing a “remake” (see footnote 6 to finding 9, infra) in one of his electronics training courses, plaintiff was held over, or “washed back” (ibid.) to Class 56-20A, which he entered on March 5, 1956.
Plaintiff continued to have difficulty with both the air and ground areas of the observer training program. On May 7, 1956, plaintiff’s academic flight commander submitted a report in which he summarized plaintiff’s flight mission performances, concluded that he was deficient in flying, alleged that his attitude and academic work were unsatisfactory, and recommended that he appear before the Faculty Board for elimination.
On May 14, 1956, plaintiff was notified, in writing, to appear before a faculty board (hereinafter referred to as the “Ellington Faculty Board” or the “Ellington Board”) which would convene on May 17, 1956, for the purpose of determining whether or not plaintiff should be eliminated from the aircraft observer training program for reason of flying deficiency. On May 17, 1956, the Ellington Board met, held a hearing, and recommended that plaintiff be eliminated from the training program due to “Flying Deficiency” and that he be declared ineligible for further “aircrew” training. The findings and recommendations of the Board were approved on May 31, 1956, by the base commander, a regular officer, who was both the convening authority and the reviewing authority.
Prior to such approval, plaintiff, by letter dated May 25, 1956, advised the Air Adjutant General, Washington, D.C., that he had submitted his resignation from the Virginia Air National Guard and expected to be released from active duty training status at Ellington AFB shortly. Plaintiff requested that his records be changed to show his home of record to be Laguna, California.
*696 By order dated June 5, 1956, plaintiff was advised that having been eliminated from the observer training program at Ellington AFB, effective May 31, 1956, he was being released from that station, and he was directed to proceed, on June 8, 1956, to Arlington, Virginia, his home of record, so as to arrive there on June 12, 1956, on which date he would be relieved of active duty training. There is no evidence of record that at that time plaintiff made any protest against his being released from active Federal service.
Plaintiff filed an application, dated October 10, 1958, together with a supporting brief, with the Air Force Board for Correction of Military Eecords, requesting that he “be reinstated in flight training, the Board (Graham Faculty Board) proceedings be stricken from the [his] record, all pay and allowances accrued be paid, and appropriate promotion credit be extended.” Plaintiff filed a second application, dated October 27, 1958, and a supporting brief, with said Correction Board, requesting the same relief as set forth above with respect to the Ellington Faculty Board proceedings. The Correction Board treated both of plaintiff’s said applications under one docket and referred them to the Office of the Judge Advocate General of the United States Air Force who, upon review thereof and the records relating to the Graham and Ellington Faculty Board proceedings, found both of said proceedings “legally sufficient”. Thereafter, in March 1959, the Correction Board denied both of plaintiff’s applications. Following considerable correspondence and requests by plaintiff for reconsideration, the Board, by letter dated February 13,1961, finally advised that the matters theretofore presented by plaintiff did not provide a sufficient basis for further review of his case and denied reconsideration.
On May 4,1961, plaintiff filed his petition herein in which, inter alia, he alleged a number of defects with respect to the composition and actions of the Graham and Ellington Faculty Boards, the conduct of those Board proceedings and the review accorded them. Plaintiff alleges that as a result of such proceedings he was improperly and wrongfully removed from flying training, flight status, and active duty for training, and that, therefore, he is entitled to active duty basic *697 pay, flight pay, and allowances for the interim period between his active duty assignments, i.e., “May 5,1955 to September 4, 1955”, and for the period “June 6, 1956, to the date of judgment,” plus any and all “other rights, privileges and allowances, including retirement and veteran’s rights” for such periods of time.[1]
Although plaintiff submitted requested findings of fact, he did not file a brief on the law. Accordingly, plaintiff’s position must be gleaned from the allegations in his petition and the assignments of errors, together with supporting arguments, set forth in the briefs attached to the two applications he submitted to the Air Force Board for Correction of Military Records, mentioned, supra. Although those briefs are similar and repetitive to a substantial degree, some of the grounds on which plaintiff attacks the Graham Board proceedings are different from those he advanced with respect to the Ellington Board proceedings. In view of the foregoing and the fact that my conclusion relative to the validity of the Graham Board proceedings is different from the one reached with regard to the Ellington Board proceedings, each of these proceedings will be discussed separately, except to the extent that certain general comments are applicable to both proceedings.
It should be made clear that plaintiff does not contend that he was qualified to continue in the pilot training program at Graham Air Force Base and that he would have been graduated at the end of the training course, if he had been permitted to continue. Nor does plaintiff claim that he met the academic and professional standards for retention in the observer — aircrew training course at Ellington Air Force Base. As indicated, supra, plaintiff’s complaints primarily consist of alleged procedural defects and errors relating to the composition and actions of the Graham and Ellington Faculty Boards, and the review accorded the reports of those proceedings. However, before embarking on a detailed discussion of those proceedings, it should be noted that in both *698 of the above-mentioned briefs, plaintiff cites a voluminous number of authorities relating to military due process that involve trials by courts-martial. Thus, plaintiff attempts to equate the standards, procedures, and evidentiary rules that have been established for the conduct of those types of cases with those applicable to faculty board proceedings such as the ones involved herein. Plaintiff’s arguments that the authorities cited are in point and controlling here, are rejected. A. courts-martial is a judicial-penal proceeding. Faculty board proceedings are purely administrative and non-penal in nature. A faculty board is without authority to take action other than to hold hearings and make recommendations which are acted upon by the convening authority after the board proceedings, findings and recommendations have been reviewed. The pertinent parts of regulations and directives applicable to administrative proceedings in general and those specifically applicable to faculty board proceedings, are set forth in the detailed findings of fact, infra, and will be specifically referred to in their proper context during the course of the discussion that follows.
I
The Graham Faculty Board Proceedings
It is my view that all of plaintiff’s complaints and contentions with respect to the Graham Board,[2] with one exception *699 (see contention. 2(b) (ii) ibid.), discussed hereinafter, should be rejected for lack of record support, merit, or as going to purely technical defects which did not prejudice plaintiff’s substantive rights. However, it is unnecessary to decide these controversial questions because, as indicated above, one of the points made by plaintiff is completely valid and this fact leaves no choice but to conclude that the Board was improperly constituted, thus rendering the proceedings fatally defective. The contention accepted and dispositive here is that the Board did not meet the quorum requirement of the regulation applicable to the Graham Board proceeding that a faculty board be comprised of a minimum of three eligible voters (ibid.).
Defendant concedes that procedures promulgated for the protection of the rights of individuals may not be lightly cast aside or ignored by administrative boards, but says that is not the situation here. Defendant points out that plaintiff accepted, without protest, the findings of the Graham Board that he be eliminated from pilot training because of flying deficiency and took advantage of the Board’s recommendation that he be afforded an opportunity for further air training. By reason of the foregoing, defendant contends that plaintiff has no case at all predicated solely upon any alleged procedural errors of form in the convening and conduct of the Graham Broad.
Defendant asserts that this court is not a forum for review of procedural matters long since accepted as immaterial *700 by tbe plaintiff and of a nature without any effect at all on an individual’s substantive rights. Defendant argues, in effect, that the legal principles set forth in the decision of this court in Wales v. United States, 132 Ct. Cl. 765, 769, 130 F. Supp. 900 (1955), and cases cited therein, are applicable and controlling in the situation presented in instant case. The soundness of the court’s decision in Wales, supra, is not questioned; but that case is not in point because instant action involves judicial and legal issues that were not before the court in Wales.
Paragraph 2 of AFR 11-1, dated December 29,1953, which prescribes procedures generally applicable to the conduct of investigations by boards of officers, reads in pertinent part:[3]
* * * Usually, * * * boards of officers are appointed under specific Air Force Regulations. These instructions are supplemental to such regulations. In case of conflict, the specific Regulation under which the board is appointed will govern. When the specific Regulation is silent on a matter covered herein, the provisions of this Regulation will apply. * * * [Emphasis supplied.]
AFR 53-15, dated June 30, 1953, “as amended”,[4] the specific regulation under which the Graham Faculty Board was appointed, does not contain any provisions pertaining to the rank which board members must have vis-a-vis a respondent appearing before a faculty board, nor a provision concerning the quorum requirements of such a board. Since said specific regulation is silent on these matters, it is apparent from paragraph 2 of AFR 11-1, supra, that we must turn to that regulation for enlightment on these matters. Paragraph 4 of AFR 11-1 reads in pertinent part:
# ^ ‡
d. Both commissioned and warrant officers may be appointed as members. Board members entitled to vote *701 will be senior to any person under investigation; and this requirement may not be waived by the respondent.
#
g. Wlien the number of voting members required to constitute either a board or quorum is specified in the appointing order or in pertinent law or regulations, no lesser number will constitute the quorum required to be present at all sessions. When the number of voting members required to constitute a board is not specified in the pertinent law or regulations, a board of not less than three voting members will be appointed and a majority of voting members so appointed, but never less than three, win constitute a quorum.
$ $ ‡ ‡
The record conclusively shows that only three of the five officers comprising the Graham Board were designated voting members thereof; that Second Lieutenant Krill was a voting member; and that the latter was junior in rank to plaintiff. (See finding 5 (c), infra.) It is plain from a reading of the above-quoted provisions of AFB 11-1, supra, that the presence of Krill on the Board was a defect that could not be, and was not, effectively waived; and that the Board did not meet the requirement that a quorum constituted of no less than three eligible voting members be present at all sessions.
Defendant’s argument that all of plaintiff’s complaints, including the one involving the above-mentioned defect, should be disregarded as “procedural errors of form” is rejected. This defect is a fatal one and cannot be brushed aside in such a cavalier manner. Therefore, despite the fact that the record of the proceedings of the Board clearly shows that its findings and recommendations were fully justified, it must be held that the Graham Board was improperly constituted. It follows that under the Air Force’s own regulations, supra, the Graham Board was without jurisdiction to hear plaintiff’s case and its proceedings void db initio.
For the above-stated reasons, it is concluded that plaintiff was improperly, wrongfully, and illegally released from active duty pilot training at Graham Air Force Base on May 4, 1955. In my opinion, the Air Force Board for Cor *702 rection of Military Eecords was arbitrary and capricious in ignoring the patent jurisdictional defect in the composition of the Graham Board, in refusing to correct plaintiff’s military records relating to the Graham Board proceedings, and in denying him appropriate relief.
II
The Ellington Faculty Board Proceeding-
Three of plaintiff’s principal complaints relating to the Ellington Board proceedings are directed to matters which raise certain questions that are substantially identical to ones involving the Graham Board proceedings.[5]
Defendant takes substantially the same position with reference to all of plaintiff’s complaints directed to the Ellington Board proceedings as it did with respect to plaintiff’s complaints regarding the Graham Faculty Board proceedings, i.e., that such complaints are based upon alleged “procedural errors” and, therefore, should be disregarded. In brief summary, defendant points out that plaintiff does not claim that he met required academic standards or performed flight missions in a satisfactory manner while a student in the observer (aircrew) training course, or that he was qualified to continue that course, and that had he been permitted to continue, he would have graduated with an aircraft observer aeronautical rating. Defendant also points out that plaintiff’s complaints concerning the Ellington Board proceedings, discussed infra, relate to alleged procedural errors and defendant argues that such defects are insufficient to support that part of plaintiff’s claim arising out of those proceedings. Defendant also points to the fact that plaintiff did not protest those proceedings, voluntarily resigned his commission in the Virginia Air National Guard, and moved to the State of California to engage in the practice of law.
Plaintiff first contends that the Ellington Board frustrated the reserve representation requirement of the Armed Forces Beserve Act of 1952, 66 Stat. 481, 496, in that it was improperly constituted because (1) the voting membership of *703 the Board included three regular, and two reserve, officers, rather than a majority of reserve officers; (2) none of the members was an Air National Guard officer; and (3) the two reserve officer members were allegedly so-called “career reservists”. The authorities cited by plaintiff in support of the foregoing contentions are rejected because they relate to courts-martial cases and problems concerning Federal recognition, rather than to the situation presented here. The Ellington Board was convened for the purpose of determining whether plaintiff should be eliminated from the observer (aircrew) training course for “flying deficiency”, a matter bearing no relationship to the type of commission held by plaintiff or the withdrawal of plaintiff’s commission.
Section 254(a) of the Armed Forces Beserve Act of 1952, supra, which contains language substantially the same as in Section 266(a) of the Armed Services Beserve Act of 1956, 70A Stat. 11, 10 USC 266, reads in pertinent part:
All boards convened for the appointment, promotion, demotion, involuntary release from active duty, discharge, or retirement of members of the reserve com-ponente shall inehide appropriate numbers from the reserve components, as prescribed by the appropriate Secretary in accordance with standards and policies established by the Secretary of Defense. [Emphasis supplied.]
Assuming, arguendo, that the Armed Forces Beserve Act of 1952, supra, was applicable here, it cannot be seriously questioned that there was an adequate number of Beserve officers on the Ellington Board. That Act does not require that a majority of the voting members of boards covered by the Act be Beserve officers and simply provides that such boards shall include “appropriate numbers from the Beserve components.” Furthermore, the Act did not establish a requirement that National Guard officers be members of a board convened for the purpose of considering an officer for any of the reasons stated in Section 254(a) of said Act. To impose or import such a requirement, when the Act requires none, is not only unnecessary but would constitute judicial legislation.
As to plaintiff’s complaint that the two Beserve officers who served as members of the Board were “Career Beserv-ists”, it is sufficient to state that there is no evidence of record *704 that said members were, in fact, Career Reservists. Furthermore, assuming, without agreeing, that those officers were in that category, there is no statutory prohibition against them serving on a faculty board such as the one under attack here. Reserve Officers are exactly that, no more — no less, regardless of whether their tenure is limited or unlimited.
Plaintiff also questions the composition of the Ellington Board on the grounds that, although medical questions were raised during the proceedings, none of the Board members were medical officers. Plaintiff argues that the lack of medical representation on the Board violated the requirements of certain applicable regulations and statutory law, and that the failure to provide him an opportunity to have certain medical questions answered by a competent medical officer during the Board proceedings was a denial of due process of law, and rendered the proceedings nugatory. In support of the foregoing, plaintiff points to the fact the Board considered medical questions raised to be of sufficient importance to include comments in regard thereto in its findings. (See Board findings Nos. 2 and 3, set forth in finding 18, infña.)
As to the Board’s finding No. 2, supra, that plaintiff’s “academic grades were adversely effected [sic] by his frequent absences from class due to visits to the flight surgeon”, it should be noted that plaintiff was recommended for elimination because of “flying deficiency”, not “academic deficiency” which is a separate ground for elimination. (See paragraph 12a and b of Flying Training Air Force (FTAF) Manual 51-4, dated October 1955, set forth in finding No. 29, infra.) It is true that Board finding No. 3, supra, contains the statement that “Lt. Henderson’s sinus trouble did adversely effect [sic] his work in the air.” However, plaintiff’s flying record before the Board and his own testimony indicates that said sinus trouble affected only three of the twelve unsatisfactory missions flown by him. Out of a total of nineteen missions flown by plaintiff, twelve missions were rated unsatisfactory. (See finding 15(b), infra, and the footnotes thereto.) With respect to two of the three unsatisfactory missions which plaintiff stated were caused by his “sinus” trouble, he also complained of other factors which adversely affected his performance on those missions. The *705 Board found that plaintiff’s “failure to demonstrate proficiency in this area was mamly due to his lack of knowledge of DR [Dead Reckoning] fundamentals.” [Emphasis supplied.]
Plaintiff also cites paragraph 16 (the correct number is 12) of Air Force Regulation 36-57 (see finding 33(a), infra, for the pertinent provisions of this regulation, as amended by AFR 36-57A, dated August 15, 1955) as authority for his contention that the Board did not have a medical member. That regulation pertains to Flying Evaluation Boards, not to faculty boards which are governed by Air Force Regulation 53-15, as amended, supra, and the latter regulation imposes no such requirement. Flying Evaluation Boards are convened to evaluate rated officers, not flying students such as plaintiff. In the event that an officer with an aeronautical rating has difficulty in a flying school, usually an advanced flying school and not a primary-basic school such as plaintiff was attending, and is recommended for elimination, he must, in addition, meet a Flying Evaluation Board which determines whether or not the aeronautical rating already acquired should be withdrawn or suspended. (See FTAF Manual, 51-4, finding 29, infra.)
A review of Air Force Regulation 36-57, as amended, supra, even if the provisions of that regulation were to be imported into Air Force Regulation 53-15, as amended, supra, indicates that medical representation is purely advisory and that such board members do not vote. Moreover, plaintiff’s complaint as to the lack of medical representation, apparently “to evaluate the relative importance of the information presented”, fails on another ground. Plaintiff admitted during the proceedings in question that he did not “have a particular [ly] high tolerance to altitude.” That, in my view, in and of itself, would be more than adequate grounds to eliminate an officer from training. In this connection, it must be remembered that students who complete the training required to acquire an aeronautical rating will in all probability be expected to fly modern-day high performance, high altitude aircraft. Inability to do so would in fact probably subject a rated officer to Flying Evaluation Board action to *706 ground him. Medical representation might assist in determining the degree of a person’s tolerance to altitude, but once a lack of it was found, as plaintiff himself admitted, it would virtually be an automatic reason for elimination of a student from a flying school on the grounds of physical deficiency. (See paragraph 12(d) of FTAF Manual 51-4, set forth in finding 29, infra.)
Plaintiff complained in the Ellington Faculty Board proceeding that drugs adversely affected the performance of his flight missions. The record does not specify the missions to which plaintiff was then referring. Apparently he was referring to the same ones on which he had his “sinus” trouble, since he does not cite any other missions on which he had a medical problem. In that assertion, however, plaintiff fails to mention that the flight surgeon had not placed him on a duty status not involving flying (DNIF). In view of the fact that plaintiff had been placed on DNIF status on other occasions, according to his own statement (see finding 14(h), infra), it is apparent that the flight surgeon did not think that it was necessary to place plaintiff on such status when the drugs in question were administered, if in fact they were. There is no evidence in the record that plaintiff requested that he be placed on DNIF status or that he ever complained about not being put on it until the time of the Ellington Board proceeding.
Plaintiff asserts that the presence of both the non-voting recorder member of the Board and the reporter during the closed session of the Board was improper and prejudicial to his rights and vitiates the proceeding; however, he does not state in what manner he was allegedly prejudiced. In support of this contention, plaintiff cites, inter alia, an opinion of the Judge Advocate General of the Air Force relating to a “Board of Inquiry” to the effect that the presence of the nonvoting recorder during the closed session of the board was contrary to the provisions of paragraph 16 (f) of AFR 35-6, dated July 27,1954.[6] It is clear from a reading of that regulation that it concerns the discharge of officers and airmen from the Air Force Reserve and that it is not applicable or *707 controlling in the type of board proceeding under question in this case. The Ellington Board was convened for the sole purpose of determining whether plaintiff was deficient in flying. Instant proceedings did not involve the discharge of plaintiff from the Virginia Air National Guard or affect the commission he then held.
Neither the specific regulation, i.e., AFB 58-15, dated May 15, 1956, supra, nor the general regulation, i.e., AFB 11-1, dated December 29,1958, supra, which are directly applicable to the Ellington Board proceedings, contain provisions that specifically permit, or prohibit, the recorder and reporter being present during close sessions of faculty board or similar proceedings. However, it may be reasonably inferred and concluded from certain provisions of AFB 11-1, and other regulations and directives that relate to administrative practices of faculty and similar type board proceedings, that non-voting members of the board, including the recorder and the reporter, are expected to be present during closed sessions of faculty board proceedings. E.g., see paragraphs 4 (b), 10 (a), 18 and 16 of AFB 11-1, supra (finding 30, infra). Also see paragraphs Si, 4i, and 24d of FTAF Manual 51-4, October 1955 (finding 29, infra). Certaintly, plaintiff has made no showing that the presence of the recorder and reporter during the closed session of the Ellington Board proceedings violated the provisions of any regulations, directives, or statutes applicable to a faculty board hearing such as the one involved herein, or that their presence was improper or prejudicial to plaintiff’s rights in any manner.
Plaintiff contends that the findings, conclusions and recommendations of the Board were based solely upon unsubstantiated hearsay testimony and incompetent documentary material, the very quantum of which prejudiced his rights and constituted denial of due process.
Plaintiff complains of the fact that the letter of May 7, 1956, written by his academic flight commander, Captain Konieczlra (set forth in finding 9, infra), containing, inter alia, a recommendation that plaintiff appear before the Faculty Board, was admitted in evidence as proof of the facts contained therein, despite the fact that Captain Konieczka had never flown with plaintiff. Plaintiff, in effect, contends that *708 Captain Konieczka’s testimony, especially with respect to the issue of “flying deficiency”, was based on the information in said letter which was furnished by other individuáis, and that no documentary evidence concerning plaintiff’s flying or academic record was presented to the Board. In this connection, plaintiff particularly complains that Captain Koni-eczka presented testimony concerning an unsatisfactory mission performed by plaintiff which was based on information furnished by the flight instructor, Captain Grohosky, who flew the mission in question with plaintiff, and he claims that the failure to have Captain Grohosky available for cross-examination constituted a prejudicial error that vitiated the proceedings. Plaintiff’s foregoing complaints and arguments are rejected. While 'Captain Konieczka’s letter and the testimony presented by him undoubtedly were accorded considerable weight, it is clear that the Board thoroughly reviewed plaintiff’s entire performance while undergoing observer training, including records covering both plaintiff’s academic studies, ground work, and flight missions.
The regulation specifically applicable to the Ellington Board proceeding, i.e., AFB 53-15, dated May 15, 1956, supra, does not contain provisions relating to the rules of evidence that apply to faculty board proceedings, but paragraph 6c (1) of that regulation does state that “AFB 11-1 contains guidance and will apply” (see finding 28, infra). While paragraph 9 (b) of AFB 11-1, supra, states that the “general observance of the essence” of certain evidentiary rules listed, including, inter alia, Hearsay Buies, “will promote orderly procedure and increase the probability of a full, fair, and impartial investigation”, that paragraph also states that “A board is not bound by the formal rules of evidence prescribed for trials by courts-martial.” (See finding 30, infra.) Thus, it cannot be seriously questioned that the Board had the discretionary authority not to observe strict rules of evidence. It is significant that at no time during the Board hearing did plaintiff object to any hearsay evidence before the Board or make an attempt to rebut the evidence subsequently questioned by him. Considering the nature of such hearsay evidence, it is considered to be compe *709 tent and highly credible. Therefore, it is concluded that the action of the Board in receiving, considering, and acting upon records, reports, grading sheets, and testimony and other evidence which, in part, was hearsay, was not improper and did not vitiate the proceedings, nor render the findings and recommendations of the Board void.
Paragraph 13 of AFR 11-1, supra, also provides in pertinent part that “Each finding must * * * be supported by evidence of record.” Plaintiff submitted a written statement to the Board and testified in his own behalf during the hearing. His written and oral statements contain several admissions as to the accuracy of the documentary material relating to both his academic and air work. In particular, plaintiff admitted the accuracy of the records indicating that he had performed unsatisfactory flight missions and he simply attempted to rationalize or find excuses for not flying these missions hi a satisfactory manner. Clearly, there was more than adequate evidence of an acceptable nature before the Ellington Board to support its findings and recommendation that plaintiff be eliminated for flying deficiency. In fact, a review of the evidence of record in this action makes it inconceivable that the Board could have made a contrary recommendation.
In connection with the foregoing, it also is considered significant that plaintiff did not submit rebuttal evidence to the Air Force Board for Correction of Military Records, or to present evidence of such a nature during the trial of this case.
Plaintiff asserts that the reviewing process and procedure relating to the Ellington Board proceedings did not conform to applicable regulations and that, therefore, he was denied effective “appellate review” of said proceedings. It first should be stated, for reasons set out, infra, that plaintiff was not entitled to an appellate review.
Plaintiff particularly complains because the same regular officer, i.e., the base commander at Ellington Air Force Base, acted both as the convening authority and the reviewing authority. Plaintiff’s arguments in support of the above-stated complaint are rejected. A review of applicable directives makes it clear that the practice of one officer serving *710 in such a dual capacity was not only properly permitted, but also was actually contemplated. E.g., see paragraph 27, entitled “Approval of Elimination Faculty Board Proceedings”, of FTAF Manual 51-4, dated October 1955, supra, which reads in pertinent part :
a. * * * The date and action taken by the Convening Authority will be indicated on each copy of the Title Page, [of the report of the proceedings]
b. Action by the Reviewing Authority. All Whig and Contract School Commanders are delegated authority to render final action on all board proceedings except * * *.
Any case on which the Convening Authority does not desire to render final action may be forwarded to this Headquarters [Flying Training Air Force, Waco, Texas] for review.
Even more persuasive than the above-quoted manual provisions are the provisions of paragraph 6d, of AFE 53-15, dated May 15, 1956, supra, the specific regulation applicable to the Ellington proceedings, which paragraph reads in pertinent part:
Approval. The commander of the ma j or air command concerned or the officer (s) he designates, will approve or disapprove all faculty board proceedings. The appointing authority may be designated as approving authority, except that in cases involving a student who is a rated officer undergoing flying training, the approving authority shall be not lower than Training Air Force headquarters. In such cases the appointing authority will recommend approval or disapproval of the faculty board proceedings. The appointing authority will review each faculty board proceeding for completeness, standardization, clarity, and, unless otherwise provided in this regulation, for legal sufficiency (paragraph 17, AFE 11-1). * * *
Plaintiff was not a rated officer, and the officer who approved the Ellington Board proceedings was not a member of the Board. (See finding 19, infra.) Therefore, the foregoing provisions are not applicable to the situation here. The only authority cited by plaintiff in support of his objection that the same regular officer reviewed the proceedings is an opinion of the Judge Advocate General/224, dated June 24, 1954, which is not in point and applicable to the *711 type of proceeding involved here. Thus, the fact that the base commander at Ellington AFB, a regular officer, acted both as the convening authority and reviewing authority with respect to the Ellington Board proceedings does not support plaintiff’s contention that he was denied effective review and that his substantive rights were prejudiced.
Plaintiff next contends that action was not taken in accordance with certain other directives also contained in paragraph 6d of AFB 53-15, supm, which read in pertinent part as follows:
* * * The appointing authority will insure that faculty board findings and recommendations are adequately substantiated. * * * Qualified personel at command level, not lower than the responsible Air Force headquarters, will review all faculty board proceedings on officers, aviation cadets, officer candidates, aviation students, students from the Air National Guard, students from the Air National Guard of the United States, and Air Force Beserve who are enrolled from their Beserve status; and foreign students.
Plaintiff has not made any showing that the appointing authority, i.e., the base commander, did not insure that the findings and recommendations of the Ellington Board were “adequately substantiated”, as required by paragraph 6d, partially quoted above. Nor did plaintiff introduce any evidence that subsequent to the time the base commander took final action and approved the Board’s findings and recommendations, the proceedings of the Board were not reviewed by “Qualified personnel at command level, not lower than the responsible Air Force Headquarters * * as required by said paragraph, with respect to “* * * faculty board proceedings on officers * * * from the Air National Guard, students from the Air National Guard of the United States * * It is clear from a reading of said paragraph that it does not require that such a review be made prior to the time the appointing authority takes the action directed therein. In the absence of proof to the contrary, it must be assumed that the proceedings were accorded the review required by the above-quoted directive. Furthermore, it appears from the evidence of record that the proceedings actually were reviewed by the Office of The Judge Advocate *712 General of the Air Force on two occasions (see finding 23 (a) and (h), infra). Therefore, the foregoing contentions fall of their own weight.
While the order of May 16,1955, appointing the Ellington Faculty Board recited that it was issued under the authority of, inter -alúa, AFR 53-15, dated June 30,1953 (without any reference to subsequent amendments of that regulation) and FTAF Manual 51-4, it cannot be questioned that AFR 53-15, as amended May 15, 1956, was the specific regulation applicable and controlling with respect to these proceedings because the latter regulation was issued on the day preceding the date of said appointing order.
It is clear from a reading of paragraph 6d of AFR 53-15, dated May 15,1956, sutpra, that plaintiff was entitled to have the proceedings of the Board reviewed for, inter alia, “legal sufficiency”. Previously issued versions of said regulation did not provide that faculty board proceedings be reviewed for legal sufficiency, and plaintiff would not have been entitled to such a review under the earlier regulations, unless, contrary to my view, the provisions of the general regulation, i.e., AFR 11-1, supra, were applicable to faculty board proceedings involving a situation essentially the same as the one presented here. The real and difficult questions here are whether: (1) AFR 53-15, dated May 15,1956, supra, should be interpreted to mean that the appointing authority, i.e., the base commander, had the authority and responsibility to review the proceedings of the Board for, inter alia, legal sufficiency, in accordance with provisions of paragraph 6d of said regulation, or (2) after the report of the proceedings had been processed for final action, i.e., approval or disapproval, it should have been submitted to the base staff judge advocate for review as to legal sufficiency before the base commander took such final action in accordance with the requirements of AFR 11-1, dated December 29, 1953, supra, and (3) the proceedings of the Board actually were reviewed for legal sufficiency by the base commander or the staff judge advocate.
Assuming, arguendo, that AFR 11-1 was applicable to the Ellington Board proceedings, plaintiff, at best, was entitled to have the report of the proceedings reviewed by the staff *713 judge advocate for legal sufficiency and not to an appellate review.
Plaintiff argues that APR 11-1, supra, was applicable to tbe Ellington Board proceedings and tbat tbe procedure of the Board did not conform with tbe requirements set forth in paragraphs 6a and 17 of that regulation. Paragraph 6a of said regulation, entitled “Notification to Persons Concerned” outlines certain steps to be taken “In every case in which the conduct, efficiency, fitness, * * * of any person is to be investigated, * * Paragraph 17, entitled “Action on Completed Proceedings”, of said regulation reads as follows:
In all cases covered in paragraph 6a, after the report of proceedings has been processed for final action, it will he submitted to the staff judge advocate for review as to legal sufficiency before such final action is taken by each commander required by law or regulation to act thereon.
In support of plaintiff’s position that AFR 11-1 was controlling here, he sets forth in his brief the following partial quote from paragraph 6c (1), entitled “Board Procedure”, of AFR 53-15, dated May 15,1956, supra: “AFR 11-1 contains guidance and will apply, * * The difficulty is that the above partially quoted sentence does not fairly present the full import of said paragraph which reads, in more pertinent part, as follows:
(1) The appointing authority will determine the procedure of the faculty-boards under his jurisdiction within the scope of applicable Air Force regulations. AFR 11-1 contains guidance and will apply, except as indicated in (2) below. * * * [Emphasis supplied.]
(2) Specifically exempted from the review requirement of paragraph 17, AFR 11-1, 29 December 1953, are proceedings of faculty boards convened to consider:
*****
(b) Proceedings involving academic deficiency, flying deficiency, and related matters in which the action of the board will not jeopardize the commission, grade, rating, or military status of the respondent or furnish the basis for possible elimination (separation from the service).
*714 (3) Proceedings of faculty boards which are to be forwarded for or used as the basis of further administrative action (for example, see paragraph 2c(6), AFB 36-2,12 February 1954)[7] or which inquire into the conduct, efficiency, fitness or pecuniary liability of the student as a member of the Air Force will require the application of all procedures prescribed by AFB 11-1. [Emphasis supplied.]
As noted, supra, the specific regulation (i.e., AFB 53-15, dated May 15,1956, insofar as the Ellington Board proceedings are concerned), controls over the general regulation (i.e., AFB 11-1, dated December 29,1953, in this case), when the former specifically covers a particular subject matter. The general regulation is controlling only when the specific regulation is silent. Therefore, the applicability of paragraph 17 of AFB 11-1, requiring review for legal sufficiency by the staff judge advocate rather than by the appointing authority is dependent upon whether or not paragraph 6a of that same regulation also is applicable, since said paragraph 17 incorporates the said 6a paragraph by specific reference to it. As noted, supra, paragraph 6a of AFB 11-1, covers cases in which the “conduct, efficiency, fitness, or pecuniary liability of any person is to be investigated”. On the other hand, paragraph 6b, entitled “Function”, of AFB 53-15, dated May 15, 1956, supra, reads in pertinent part: “The faculty board will consider all matters concerning proficiency, deficiency, graduation, and elimination of students from a course of training. * * *”
Clearly, the matters covered by the question raised as to whether or not a student-trainee should be eliminated because of “flying deficiency” (the specific issue before the Ellington Board), relate to “proficiency” and “deficiency”, as used in paragraph 6b of AFB 53-15, supra, rather than to “conduct” or “efficiency”, as used in paragraph 6c of AFB 11-1, supra. (Disciplinary, conduct, and efficiency matters would, basically, be considered pursuant to the provisions of AFB 36-2, supra (see finding 32, infra).) In this connection, it should be noted that paragraph 8b(l), (2), (3) and (4) of AFB 11-1, further defines the words “* * * conduct, efficiency, *715 fitness or pecuniary liability * * *”, appearing in paragraph 6a of said regulation by providing that a person under investigation who is not entitled, under the law or a specific regulation, to counsel as a matter of right “* * * will be afforded the privilege of military counsel of his own choosing, if reasonably available, or civilian counsel at his own expense, * * * in any proceeding which may fairly be regarded as: (1) Subjecting him to possible criminal prosecution, or disciplinary or corrective administrative action; (2) Jeopardizing a commission, rating, grade, or status; (3) Furnishing cause for possible elimination or demotion proceedings against him; or (4) Imposing pecuniary liability upon him.”
Some confusion, leading to an erroneous conclusion, could be generated if the above-quoted provisions ((2) and (3), supra) are misread and their meaning improperly interpreted. In this connection, it first should be noted that neither plantiff’s commission in the Air National Guard nor his grade (rank) was placed in jeopardy as a result of the Ellington Board proceedings. While the successful completion of the observer (aircrew) training program would have entitled plaintiff to an aeronautical rating, it must be kept in mind that at the time of the Ellington Board proceeding, plaintiff had not as yet acquired such a rating. Thus, the proceeding could not be fairly regarded as jeopardizing a commission, rating or grade then held by plaintiff. An argument could be made that plaintiff’s military “status” was jeopardized; but the word status is subject to so many different definitions that any attempt to define it in the context used here would require assumptions of a highly speculative nature that are not warranted by the facts in this record.
In my view, paragraphs 6a and 8b of AFE 11-1, supra, primarily relate to investigations that are quasi-punitive in nature and which may adversely affect a persons military status in a manner not contemplated by the Ellington proceedings.
That at least prior to the issuance of AFE 53-15, dated May 15, 1956, it was not contemplated that the proceedings of faculty boards convened for the purposes of the Ellington Board be reviewed in accordance with the provisions of AFE *716 11-1, is clearly shown by the provisions of paragraph 10 of FTAF Manual 51-4, dated October 1955, swpra, which reads as follows:
10. Faculty Boards convened solely for determining matters related to the proficiency, deficiency and elimination of students will not be subject to review by a Staff Judge Advocate under the provisions of AF Begulation 11-1. Any requirements for inquiry into the proper discharge of a student’s legal or moral responsibilities as a member of the TTSAF will be referred for action before a court-martial or appropriate board. Such action will then be subject to review in accordance with the TJMCJ or AF Begulation 11-1.
Admittedly, the above-quoted provision is contained in a general manual which was not specificially applicable to the Ellington Board proceedings, and, therefore, AFB 53-15, dated May 15, 1956, is the controlling regulation insofar as the proceedings of that Board are concerned; but AFB 51-4 does show that at the time it was issued, Air Force officials did not intend that AFB 11-1 apply to faculty board proceedings such as the Ellington proceedings, and it is significant to note that FTAF Manual 51-4 was still in full force and effect at all times material to the Ellington proceedings.
In order to finally resolve the question as to the applicability of AFB 11-1, supra, to the Ellington proceedings, it is necessary to examine very closely the provisions of paragraphs 6c (1) and, particularly, 6c (2) (b) of AFB 53-15, dated May 15, 1956, supra. It will be noted from a reading of these two paragraphs, quoted, supra, that proceedings of faculty boards are exempted from the review requirement of paragraph 17 of AFB 11-1 in those instances in which the boards are convened to consider, inter aim, “Proceedings involving * * * flying deficiency, * * * in which the action of the board will not jeopardize the commission, grade, rating, or military status of the respondent or furnish the basis for possible elimination (separation from the service)” (Emphasis supplied.) For the reasons stated in connection with my discussion of paragraph 8(5) of AFB 11-1, supra, plaintiff does not come within the review exemption specified in paragraph 6c(2) of AFB 53-15, dated May 15,1956, supra. *717 on the grounds that the action of the Board jeopardized his grade, rating or military status. But the above-underlined words are especially troublesome because a strong argument can be made that as a result of the Ellington Board proceedings plaintiff was eliminated from active duty training and that such action was equivalent to his being separated from the service. However, this argument is not completely persuasive and to accept it would require assumptions which cannot be justified on the basis of this record.
While plaintiff’s “elimination” from active duty training was undoubtedly the result of the recommendation of the Board, such elimination was primarily caused by the method by which plaintiff entered active duty to attend the observer training school. Air National Guard officers, generally, and plaintiff, particularly, entered on active duty for the prescribed period of training unless sooner relieved by proper authority. (See, e.g., plaintiff’s orders mentioned in finding 8, infra.) Other categories of personnel, such as persons commissioned under the Air Force B.OTC program, cadets and foreign officers, also entered flying training. The elimination of such persons from flying training, however, did not necessarily mean that they would be released from active duty or lose any commission held by them. See, e.g., paragraphs 30 and 31, Air Force Manual 51-4, supra. Such personnel remain on active duty upon completion of their training, rather than returning home as is done by Air National Guard flying trainees.
The fact that as a result of the Ellington proceedings plaintiff was eliminated as a student trainee from the observer program at Ellington AFB, does not mean that he was eliminated in the sense of being separated from the service. After plaintiff’s elimination and release from active duty training, he still would have held the same commission in the Virginia Air National Guard that he had at the time he was ordered on active duty, if he had not voluntarily submitted his resignation from the Guard prior to the time the Ellington Board proceedings were approved. While his elimination undoubtedly foreclosed plaintiff from ever attaining an aeronautical rating that would make him eligible for “flying *718 status” duties, there is nothing in the record to show that he could not have remained in the Guard and served in some capacity on the ground as a commissioned officer in the same grade then held by him.
On the basis of the foregoing discussion, it is concluded that AFR 11-1, supra, was not applicable to the Ellington Board proceedings and that, therefore, it was not necessary for the report of the proceedings of that Board to be submitted to the staff judge advocate at Ellington AFB for review as to legal sufficiency, in accordance with the requirement of paragraph 17 of said regulation, prior to the time final action was taken by the base commander at Ellington AFB. It is concluded that plaintiff was entitled to have the proceedings reviewed for, inter alia, legal sufficiency, by the appointing authority, before final action was taken by the base commander.
The fact that the order appointing the Ellington Board was dated May 16,1956, and recited that it was issued under the authority of AFR 53-15, dated June 30, 1953, without reference to AFR 53-15, dated May 15,1956, supra, indicates the probability that appropriate personnel at Ellington AFB either did not actually receive, or read, the latter regulation prior to the time the appointing order was issued. However, the record does not disclose the actual facts with respect to the foregoing matter. Nor does the record disclose the nature, if any, of the review accorded the Board proceedings, prior to the time they were approved by the convening and reviewing authority, i.e., the base commander. But, keeping in mind that the Board made its findings and recommendations on May 17, 1956, and that the proceedings were not approved until May 31, 1956, it may be reasonably assumed that the base commander was aware of the review requirements of AFR 53-15 dated May 15, 1956, at the time he took final action. Absent evidence in the record to the contrary, it also may be reasonably assumed that the base commander acted properly and reviewed the report of the proceedings in accordance with the directives set forth in said regulation and that, therefore, he reviewed the proceedings for, inter alia, legal sufficiency. Even if the foregoing assumptions are not well founded or accurate, this fact would not justify a *719 finding that the Ellington Board proceedings were legally deficient on the grounds that the proper review procedures were not followed, because the record shows that the proceedings were subsequently reviewed on two occasions and found to be legally sufficient by the Office of The Judge Advocate General, Headquarters, United States Air Force, Washington, D.C. (See finding 23(b), infra.)
It must be kept in mind that although plaintiff had full opportunity to attack the legal sufficiency of the Board’s report, as well as to submit such additional evidence as he deemed necessary to the Air Force Board for Correction of Military Records, plaintiff took no such action. Plaintiff merely submitted the briefs relating to the Graham and Ellington Board proceedings which simply contain arguments without new supporting evidence.
Considering the entire record, it is concluded that the Ellington Board proceeding was legally sufficient and that the findings and recommendations of the Board were more than adequately supported by the record thereof.
To sum up the discussion of the Ellington Board proceedings, it is my conclusion that plaintiff’s complaints relating thereto are without merit; that the Board was properly constituted; that its findings were more than adequately substantiated by acceptable evidence; that the recommendations were proper, reasonable and fully justified; that the Board proceedings were conducted in substantial compliance with applicable regulations, directives, and statutory law; that none of plaintiff’s rights were substantially prejudiced; and that the action of the Air Force Board for Correction of Military Records in denying plaintiff’s request for correction of his records relating to the Ellington Board proceedings was not arbitrary or capricious. In my view, any defects in the proceedings of the Ellington Board related to procedural matters and were of such a technical nature that they may be disregarded under the reasoning of the court in Denton v. United States, 144 Ct. Cl. 840, cert. denied, 361 U.S. 821 (1959); cf. Narum v. United States, 151 Ct. Cl. 312, 287 F. 2d 897 (1960), both of which cases involved court-martial actions that unquestionably call for more exacting standards, *720 procedures and evidentiary rules, in order to satisfy tlie requirements of military due process, than those applicable to faculty board proceedings.
In view of the foregoing conclusions relating to the Graham and Ellington Faculty Board proceedings, an unusual situation is presented. In brief, the Graham Board was technically jurisdictionally defective and the proceedings of that Board were invalid. On the other hand, the Ellington Board proceedings were not defective. In this posture, absent other material facts, plaintiff would be entitled to appropriate monetary relief for the period from the time he was improperly eliminated from pilot training at Graham AFB until he was properly eliminated from the observer program at Ellington AFB. However, it must be kept in mind that despite the jurisdictional defect in the composition of the Graham Board, plaintiff, subsequent to his involuntary release from training at Graham AFB on May 4,1955, took advantage of the approved recommendation of that Board that he be afforded further aircrew training by entering, on September 5,1955, active duty in order to attend the observer training course at Ellington AFB, Texas. For that reason it is my view that plaintiff should be estopped, as of September 5, 1955, from taking advantage of the jurisdictional defect of the Graham Board and that he is not entitled to recover from that date forward. Plaintiff is not entitled to “eat his cake and have it too”.
In summary, considering the record as a whole, it is my opinion, for reasons stated hereinbefore, that the Air Force Board for Correction of Military Records acted in an arbitrary and capricious manner when it ignored the jurisdictional defect in the Graham Faculty Board and denied plaintiff appropriate relief along the lines requested in his application of October 10,1958, relating to the proceedings of that Board, at least for the period from May 4 to September 4,1955, inclusive. It is my further opinion that the action of the Correction Board in denying plaintiff’s application of October 27, 1958, relating to the Ellington Faculty Board proceedings, and refusing to grant the relief requested in said application, for the period commencing June 13, 1956, was *721 not arbitrary or capricious, or not supported by substantial or legally sufficient evidence.
Finally, therefore, it is my opinion that plaintiff is entitled to bis accrued pay, including flying pay and allowances, during the period from May 4,1955 to September 4,1955, inclusive (less any proper set-off defendant may have, as suggested by plaintiff, mentioned, supra). Accordingly, it is recommended that judgment be entered for plaintiff to that effect, the exact amount to be determined by further proceedings conducted pursuant to Rule 47 (c) (2) of this court.
FINDINGS on Fact
1. On August 5, 1954, plaintiff, who was then a first lieutenant in the United States Army Reserve, accepted an appointment as a second lieutenant in the District of Columbia Air National Guard, and he was assigned to the 121st Fighter Bomber Squadron as a jet fighter pilot trainee. By reason of that appointment, plaintiff was discharged from the officer’s Reserve Corps on December 30, 1954. Plaintiff was promoted to first lieutenant in the said Air National Guard on March 19, 1955, pursuant to Special Orders No. 56, and Federal recognition was granted to him as a first lieutenant on the same date.
2. On January 24, 1955, Headquarters of the District of Columbia Air National Guard issued Special Orders No. 16 for plaintiff to report to the Commander, 3300th Pilot Training Squadron, Graham Air Force Base (AFB), Mari-anna, Florida, for the purpose of undergoing jet pilot training, in grade, in Class 56-K. Pursuant to that order, plaintiff entered on active duty on March 20,1955, and he reported for training at said base on or about March 22,1955. Graham AFB was a primary pilot training base operated by a civilian contractor. Satisfactory completion of primary and basic training would have resulted in plaintiff being awarded the aeronautical rating of pilot. Special Orders No. 16, supra, provided, inter alia, that the duration of plaintiff’s training course would be approximately “16 months unless sooner terminated or graduated”, and that upon completion of the course, “unless sooner released by proper authority”, plaintiff would be returned to his home.
*722 3. On April 21, 1955, plaintiff failed to obtain a satisfactory rating on a progress check flight given by Captain Traverse P. Hight, Jr., an instructor and Air Force check pilot assigned to the 3300th Pilot Training Squadron. In a progress check report submitted on the same date, Captain Hight graded plaintiff’s flight mission as “unsatisfactory” and assigned to him a “T” score of 34.[1] The progress report consists of two parts. The first part, on FTAF Form 29, is entitled “Progress Check”. The second part, on FTAF Form 28A, is entitled “Contact Grade Slip”. Both parts were signed by Captain Hight. The check flight was made in a (Piper) PA-18 type aircraft and lasted one hour and 15 minutes. The report indicates that as of the date thereof, plaintiff had logged thirteen hours and eight minutes of dual flying time; that he had made twenty-four landings; that he had had two instructors; that he had had three progress checks; and that during his flying training he had had twelve unsatisfactory grades.[2] In addition to containing the above facts, Captain Hight’s report reads in pertinent part:
A review of this student’s records reveals he has been unable to perform procedures correctly. He cannot properly control the aircraft insofar as pitch, bank and power is concerned. He has been unable to use effective trim. He does not retain instructions. He has shown signs of apprehension. He has had trouble with traffic from take-off to completion of after-landing roll. He does not divide his attention. He does not think ahead of the aircraft. He has been tense. He has not been airsick. There is one special statement.
This student received a progress check this date covering judgment, progress and technique commensurate with his time and instruction received and was fomid to be failing.
The student taxied too close to the aircraft in front of him. The first turn with traffic was made across the go-around leg without first clearing himself. After leaving traffic the student waited too long before heading toward the area. The airspeed in the climbing turns *723 was generally 65. 100 feet was gained in the clearing turns for the power-on stalls. The bank decreased in the stall to the right and the recovery from the stall straight ahead was nose low. 150 feet was lost in the clearing turns for a spin, the spin was for one turn instead of two, the recovery airspeed was 125, rudder control was extremely erratic in the recovery and power was added too soon causing the prop to overspeed. The bank decreased to zero degrees in the power-off stall to the left and rudder control was erratic. The recovery from the stall to the left was before the first indication. The student holds the nose down too long in the entries and recoveries. The airspeed in the gliding turns was from 65 to 55, coordination was weak, the nose was held down when clearing the engine and the level-off was completed below the minimum altitude. Two forced landings were given. The final turns were completed below the minimum altitude and the landings were crosswind and would have been completed past the selected fields. The student flew four traffic patterns and one pattern was flown by the cheek pilot. The student was given control of the aircraft on the base leg and told to complete the pattern and landing. The throttle was closed almost at the point where the final turn was to be started and as a result the student had to go-around because he would have overshot. On the upwind leg the student was instructed to fly the same pattern and close the throttle at the correct 45 degree point. The last pattern was placed in the same ground track as the first three patterns which were unsatisfactory due to students judgment in ground track, airspeed and altitude control, power control and drift corrections. The check pilot used power on the base leg and final approach of the last pattern so that a landing could be effected. After touchdown the aircraft ballooned and the student jockeyed the stick in the recovery action. Directional control was weak in the after-landing roll. The student displayed a definite lack of feel of the aircraft during the flight. He was continually trimming the aircraft and while doing this his attention would be diverted from his flying resulting in poor altitude and power control. The student was momentarily lost in the area but oriented himself in a short-time.
This student did not appear to be apprehensive nor did he become airsick during the flight He appeared to be tense and nervous. He was inf ormea that this was an unsatisfactory flight and of the check pilot’s recommendation.
*724 I consider this student’s flying to be a source of danger to himself and to others and recommend he be eliminated from the flying training program.
The FTAF Form 28A part of the (progress) report, supra, is a grading slip in which all aspects of the flight performance are susceptible of grading. It does not appear that plaintiff was graded on all possible areas. However, all of the performance grades given him were unsatisfactory.

The Graham Faculty Board Proceedings

4. By Flying Air Force Training (FAFT) Form 110, dated April 25,1955, the Office of the School Secretary, Graham AFB, notified plaintiff that he was to appear before a faculty board (hereinafter referred to as the “Graham Faculty Board” or “Graham Board”), which would convene at 1:00 p.m. on April 26,1955, for the purpose of determining whether or not plaintiff should be eliminated from the pilot training program because of “flying deficiency.” The notice included, inter alia, a statement that the evidence to be presented at the hearing would include flying training and academic records and medical reports. Plaintiff signed the Form 110, supra, indicating his receipt thereof on April 25, 1955. Above his signature, plaintiff also indicated that he had been notified a reasonable time in advance of the fact that he was to appear before the Board; that he did not desire to secure personal counsel; that he did not desire to call any witnesses in his behalf; and that he had been fully advised of his rights under Article 31 of the Uniform Code of Military Justice. Subsequently, on April 25, 1955, plaintiff was orally notified that the Board would convene at 7:30 a.m., instead of 1:00 p.m., as originally scheduled, on April 26, 1955. There is no evidence that plaintiff objected to the change in time thereof, or claimed that he had not been given sufficient notice prior to the hearing to enable him to become acquainted with the law and facts in preparation for his appearance.
5. (a) The Graham Faculty Board convened at 7: 30 A.M. on Tuesday, April 26,1955. The Board was appointed pursuant to, and relied for its authority on, Special Order No. *725 86, Headquarters 3300th Pilot Training Squadron (CONTB PBIM), Graham Air Base, Marianna, Florida, dated August 14-, 1953, which order was promulgated under the authority of Air Force Begulation (AFB) 53-15, dated June 30, 1953, “as amended”.[3] That order appointed as board members the Senior Military Training Officer, Operations Officer, Military Check Pilot, Security Officer (nonvoting), Becorder (non-voting), Civilian Contractor (nonvoting), and Foreign Administrative Officer (non-voting).
(b) Plaintiff was the only witness who presented oral testimony. Prior to testifying, plaintiff was advised of his rights under Article 31 of the Uniform Code of Military Justice. Plaintiff did not object to the appointing order, dated August 14, 1953, on the grounds that it “was too old to validly appoint a board on April 26,1955”, or on any other grounds.
(c) The Graham Faculty Board, which plaintiff actually met, was composed of the following personnel whose dates of rank (DOB), status (whether Begular or Beserve), aeronautical rating (if known) and position are indicated:
Major Frank P. Bryan, Beserve, a rated pilot, Operations Officer and President of the Board — DOB January 8, 1952; First Lieutenant James P. McAdams, Beserve (Aeronautical rating, if any, unknown), a Military Training Officer, but not the Senior Military Training Officer — DOB February 25, 1954; Second Lieutenant John L. Krill, Beserve, a rated pilot, Military Check Pilot — -DOB October 13,1954; Captain Leslie W. Matis, Beserve, (Bating, if any, unknown), Becorder (non-voting) — DOB unknown; and Mr. James N. Wharton, a civilian, Civilian Bepresentative (not the Civilian Contractor (non-voting)).
The first three named officers were the only members of the Board who were empowered to vote. Plaintiff did not express any objection to the Board as a whole, or challenge any member thereof, on any grounds whatsoever.
*726 (d) At the request of the President of the Board, 2/Lt. Krill (who, as noted in (c), supra, was a Military Check Pilot and voting member of the Board) introduced into evidence the “Progress Check” report dated April 21,1955, and signed by Captain Plight (see finding 3, supra). Lt. Krill merely sponsored said report as an exhibit and did not present oral testimony. Plaintiff did not object to the report being received as a part of the record in the proceeding on the grounds that it was hearsay or any other grounds; nor did he ever request that Captain Plight be called as a witness in order that he might be cross-examined in regard to the Progress Check report; nor did he complain that Lt. Krill, as a voting member of the Board, had become an “adverse witness” by reason of his offering the report in evidence, or claim that by taking such action, Lt. Krill had disqualified himself from further eligibility to sit on the Board.
(e) The academic and medical report relating to plaintiff, which was presented in evidence without objection, reads in pertinent part:
2/Lt Henderson, Richard S. reported for training on 22 March 1955. Student has completed 38 hours of Academic Training. His Academic Average is 47. His Class Standing is Average.
There have been no failing grades.
Student was cleared for flying by the Flight Surgeon this Base 24 March 1955. He has lost no days due to Dnif and no days due to confinement in hospital and quarters. He does not present a medical problem at this time.
(f)' Upon questioning by the Board, plaintiff agreed that he had received fair treatment during the course of his training; that judgment of distance was his main problem; and that his eyes were in good condition. Plaintiff also agreed that a fair picture of his progress in training had been presented to the Board. He did not object to the introduction of any documentary material in evidence on the grounds that it was hearsay, or for any other reason. At the close of the open session of the Board, plaintiff was excused and informed that he would be recalled as soon as a decision had been reached; thereupon, plaintiff withdrew from the hearing *727 room. The non-voting Recorder and the non-voting civilian representative remained in the room with the Board during the deliberations. Following deliberation, a secret written ballot was taken by the Board members. After the votes had been counted by the Recorder and confirmed by the President, plaintiff was summoned to reappear before the Board, Plaintiff was advised that by vote of the Board it had recommended that he be eliminated from the Pilot Training Program due to “Flying Deficiency”, but that he also had been recommended for further “Aircrew Training”. Upon being asked whether he had any further questions, plaintiff re-sponsored in the negative and, thereafter, he was excused by the Board.
6. On April 26,1955, the Graham Faculty Board made the following Findings and Recommendations:

FINDINGS:

_ 1. This student was courteous, military and cooperative. He apparently had received adequate training. Though experiencing some difficulty in adjustment initially, there had been no irregularities in the progress of his training. He was rather verbose in his explanations and had a tendency to expend too much effort on rationalizing his lack of progress.
2. His Academic average was forty-seven (47) and though he only completed a short part of his Academic Training, it is felt that these grades also reflect his difficulty in adjustment. He had presented no medical or military problem and apparently felt that he had received fair treatment.
3. This student seems to be well motivated and appears to have made adequate effort to progress.

REO OMMENDA TI ONS:

1. It is the decision of the Faculty Board that Lt. Henderson should be eliminated from the Pilot Training Program due to Flying Deficiency.
2. He is not recommended for reinstatement into this course at a later date.
3. Lt. Henderson is recommended for further Aircrew Training.
7. The Graham Faculty Board’s Findings and Recommendations were approved on May 3,1955, by Lieutenant Colonel Evans G. Stephens, a rated, Regular Air Force Officer, who *728 was both the convening authority and the reviewing authority; however, he was not a member of the Board plaintiff met. By Letter Order No. 41, dated May 4, 1955, plaintiff, having been eliminated on May 3, 1955, from further pilot training by reason of “Flying Deficiency” pursuant to the Graham Faculty Board Proceedings, was ordered to proceed to his home of record in Washington, D.C. As best it can be determined from the record which is not entirely clear, plaintiff’s active service terminated upon his scheduled arrival home on or about May 7, 1955. The record does not reflect that plaintiff protested the action taken in releasing him from active service or express any objections to the Graham Board proceedings, its findings and recommendations or the review made thereof, until October 10, 1958, when he submitted an application for correction of his military records to the Air Force Board for the Correction of Military Eecord.[4]
8. On June 14, 1955, plaintiff was appointed a first lieutenant in the Virginia Air National Guard and he was granted Federal recognition in that grade on the same date. On August 23,1955, the Adjutant General of the Commonwealth of Virginia, Virginia Air National Guard, issued Special Orders No. 70, placing plaintiff on active duty, effective September 5,1955, and directing him to report to the Commander, 3609th Student Squadron,[5] Ellington Air Force Base, Houston, Texas, on September 8, 1955, for the purpose of attending Observer Training-In-Grade Class, 56-14C. This action was consistent with, and implemented, the recommendation of the Graham Faculty Board that plaintiff be afforded an opportunity for “further Aircrew Training”. (See finding 6, supra.) Those orders further specified that active duty training was to be for a period of one year or more and that upon completion of the course, unless sooner relieved by proper authority, plaintiff was to return to his home station. On September 8, 1955, plaintiff reported to Ellington AFB, and he commenced observer training on or about September *729 9, 1955. Said course of training led to the aeronautical rating of Aircraft Observer. Plaintiff was placed upon student flight status and commenced drawing pay for flying on or about September 15,1955.
9. As a result of failing a remake on “AO 23”[6] in Class 56-14A, plaintiff was held over — “washed back” — to Class 56-20A, which he entered on March 5, 1956. He continued to have difficulty in the latter class of the observer training program. In a communication directed to plaintiff’s commanding officer under date of May 7, 1956, plaintiff’s Academic Flight Commander, Captain Daniel J. Konieczk, USAF, summarized plaintiff’s deficiencies and recommended that he appear before the Faculty Board for elimination from the Primary Basic Observer Cadet Training Program. That communication reads, in pertinent part:
Lt. Henderson, presently in Class 56-20A, is deficient in flying. He flew twelve missions with his former Class, 56-14A, six of which were unsatisfactory. His scores on the Ground Speed by Timing and Multiple Drift Evaluation Check and Remake with 56-14A are as follows: FM-4 — Raw 42; FMC-5 — Raw 36, T34; FMC-5 Remake — Raw 58, T42. As a result of his failure to AC-23 Remake, he was held over to Class 56-20A. He repeated the following Flight Missions in 56-20A with the following results: FM-2 unsatisfactory; FM-3 unsatisfactory; FM-4 unsatisfactory; FM-7 unsatisfactory; FM-8 unsatisfactory; FMC-5 Raw 33, T27.
In counselling periods, Lt. Henderson has stated that classroom instruction and TPOs are adequate, however, he says that he does not understand the material and feels that he would need additional instruction in order to complete the course. He has had the major portions of the work twice, and he has never asked for extra help.
I feel that Lt. Henderson has shown a poor attitude by the fact that he had been washed back and he still persisted in missing classes to the point that it was necessary to reprimand him militarily. Lt. Henderson was extremely critical of the instructors when he was held *730 over to Class 56-20A — this took the form of a heckling attitude during class periods, thereby distracting from the presentation of the instructor.
In view of his attitude, and failures, and lack of ability, it is recommended that he appear before the Faculty Board for elimination.

The Ellmgton Faculty Board Proceedmgs

10. By Flying Air Force Training Form 110, dated May 14,1956, the Office of the School Secretary at Ellington AFB notified plaintiff to appear before the Faculty Board (hereinafter referred to as the “Ellington Faculty Board” or the “Ellington Board”) which would convene at 9:00 A.M. on May 17,1956, for the purpose of determining whether or not plaintiff should be eliminated from the Aircraft Observer Training Program by reason of “Flying Deficiency.” The notice included, inter alia, a statement that the evidence to be presented at the hearing would include flying training, and academic records, and that Captain Konieczka would be called as a witness by the Board. Plaintiff acknowledged receipt of that notice by placing his signature thereon. Plaintiff indicated above his signature on the notice that he had been notified of the hearing a reasonable time in advance; that he did not desire personal or military counsel to represent him; and that he desired to call two witnesses in his behalf, namely 2/Lt. Leroy Brown, Class 56-14A, and 1st Lt. D. G. Worden, Instructor, Electronics.
11. The Ellington Board met, as scheduled, at 9: 00 A.M. on May 17, 1956. The Board was appointed pursuant to Letter Order No. 137, dated May 16,1956, which was promulgated under the authority of, inter alia, paragraph 7(a) of AFR 53-15, dated June 30, 1953, as amended,[7] and Flying *731 Training Air Force (FTAF) Manual 51-4, dated October 1955.[8] Letter Order No. 137 named 14 officers as members of the Board, three of whom, including one designated as the Beeorder (Second Lieutenant Bichard B. Dillenbeck), were shown as “non-voting” members.
12. The Ellington Faculty Board, which plaintiff actually met, was comprised of Major Herbert I. Butler, President and Group Executive Officer, who was a rated, Begular Air Force Officer; Major John W. Hillen, Jr., group operations and training officer, a rated, Begular Air Force Officer; Captain Thomas A. Boiler, a Training Analysis and Development Officer (T.A.D.O.), and a rated Air Force Beserve Officer; Captain Carl H. Erickson, a T.A.D.O., and a rated, Air Force Beserve Officer; Captain Bobert L. Christie, a T.A.D.O., and a rated, Begular Air Force Officer (all of whom were voting members); and 2nd Lieutenant Bichard B. Dillenbeck, a non-rated, Air Force Beserve Officer, who was the designated Beeorder and a non-voting member. The record does not disclose whether the above-named board members were rated as Pilots or Observers (Navigators).
In summary, the Board was comprised of six officers (less than one-half of those appointed to the Board by Letter Order No. 137 (see finding 11, sufra)), including one non-voting officer (the Beeorder), and five voting members, three of whom were regular Air Force officers and two were Air Force Beserve Officers.
13. (a) The report of the Ellington Board proceedings disclose that plaintiff appeared without counsel and indicated that he did not desire personal or military counsel. Plaintiff was advised, and he understood, that he had a right to be represented by counsel of his own choice; that the Board *732 was a fact-finding body and not a punitive board; that he had a right to call witnesses, cross-examine adverse witnesses, submit evidence, testify under oath or remain silent, make and submit written statements, and file a brief. Plaintiff also was advised of his rights under Article 31 of the Uniform' Code of Military Justice.
(b) Plaintiff admitted that the FTAF Form 110 (finding 10, supra) by which he was notified of the Board hearing, bore his signature; that it was correctly dated; and that such notice was received by him a reasonable time in advance of the hearing. The form was admitted in evidence without objection by plaintiff.
(c) Plaintiff did not express any objection to Letter Order No. 137 appointing members of the Board, which order was in evidence during the hearing. He did not challenge the Board, as a whole, or any member thereof, on any grounds whatsoever, including, specifically, that it was improperly constituted and without jurisdiction to hear a case concerning a National Guard Officer (plaintiff’s then status) because it was composed of three regular and two reserve officers; and that the two reserve officers who voted were “career reservists”. Plaintiff did not express any obj ections to the fact that none of the members of the Board were medical officers; nor did he contend that there should be medical representation on the Board to consider questions concerning plaintiff’s physical condition and his numerous visits to the flight surgeon’s office which arose during the hearing.
14. (a) During the course of the Ellington Board hearing, plaintiff submitted a written statement, prepared prior thereto, dated May 15, 1956, to which was appended several statements. One of these statements was signed by three officers, at least two of whom apparently were plaintiff’s instructors in electronics, who stated that plaintiff’s conduct and attitude in class “has been in no way unusually different from that of his classmates nor has it deviated from the commonly accepted standards of courtesy and decorum,” and *733 that they had “never felt it necessary to comment adversely on his classroom conduct.” One of these same officers also signed a statement to the effect that plaintiff had attended extra instruction in electronics under his supervision. Four other officers signed a statement to the effect that on more than one occasion plaintiff had solicited assistance from them in solving problems from an electrical mathematics textbook.
(b) Plaintiff also introduced in evidence a statement dated May 14, 1956, which reflects that he made nineteen visits to the flight surgeon’s office between November 30, 1955 and April 23, 1956, on the dates indicated: November 30, 1955; December 12, 1955; January 16, 1956, DNIF;[9] January 17, 1956; January 30,1956; February 2,1956; February 6,1956; February 7,1956; February 10,1956, Eeturn to FO;[10] February 21, 1956; March 16, 1956; March 21, 1956; March 23, 1956, DNIF;[9] March 28,1956; April 2,1956; April 5,1956; April 10,1956, Eeturn to FO;[10] April 11,1956 and April 23, 1956. Plaintiff was usually at the flight surgeon’s office five to six hours per week, but not every week. The average was four hours per week, sometimes more, sometimes less.
15. (a) It does not appear from the report of the Ellington Faculty Board proceedings that plaintiff’s “Student Eecord — Flying Training”[11] was actually offered in evidence as a documentary exhibit during the hearing; but it is clear from the report of the proceedings dated May 17, 1956,[12] which includes, inter alia, recorded testimony, cross-examination, statements of the Eecorder, and comments made by Board members in connection with their questioning of plaintiff, that his student record of flying training was before the Board at the time of the hearing. The record reflects, inter alia, the following information:
*734 a. Academic Training Record
Subject Grade[13]
Maps, Charts and Dead Reckoning Equipment- 37 (47)
Physiological Indoctrination_57
Elementary Dead Reckoning_42
Weather_45
Dead Reckoning Aids_ 40 (49)
Electricity and Magnetism_ 35 (54)
Airplot and Dead Reckoning Techniques_ 40 (43)
Loran Navigation_43
Alternating Current_34 (31)
Aural and Visual Code- Satisfactory Completion
Equipment Orientation_ Completed
Average Grade- 41
(b) Plaintiff’s flying record, insofar as is ascertainable from documents in tbis record, is as follows:[14]
Might Mission Subject Covered Results Class 56-14 Class 56-20
No grade.. Unknown_ Unknown, if flown.
DR aided [15] by MD & GS xT. Unknown [16]_ Unsatisfactory.
DR aided by MD & GS x T__ Unknown_ Unsatisfactory.
DR aided by MD & GS x T_. Raw 42_ Unsatisfactory[17]*[18] *
6 (Check).... DR aided by MD & GS x T_. Failure Raw 36, T-84. Failure ”[19] Raw 33, T-27.
5 (Check) (Remake). DR aided by MD & GS x T_. Passed Raw 58, T-
6_ AVERAGE of the two-above missions. Failure T-84 (42) (27).
DR aided by Airplot, Map Reading & Radio.
DR aided by Airplot, Map Reading & Radio. Unknown.. Unsatisfactory.1
DR aided by Airplot, Map Reading & Radio. Unknown-Unsatisfactory.
Unknown_ Unknown.. Unknown.
10-, Unknown_ Unknown-Unknown.
11-, Unknown___ Unknown.. Unknown.
Total Missions Flown: 19 — Total Unsatisfactory Missions Flown: 12. Total Hours Flown: 99 Hours and forty-five minutes
*735 16. (a) Captain Daniel J. Konieczka, plaintiff’s Class 56-20A Academic Flight Commander, was called as a witness by the Board and presented testimony concerning plaintiff’s military, academic and flying records in support of the statements set forth in his letter of May 7, 1956,[20] in which he recommended that plaintiff appear before a faculty board for elimination (see finding 9, supra). Captain Konieczka was not plaintiff’s academic flight commander at the time he was in Class 56-14A. He first became acquainted with plaintiff about the time he entered Class 56-20A on March 5, 1956. Captain Konieczka had never flown with plaintiff, but he did counsel him on a number of occasions subsequent to the time he entered said class. It is clear that, with the exception of testimony presented by Captain Konieczka with respect to counseling sessions he had with plaintiff and certain classroom observations he personally made, his testimony concerning plaintiff’s academic work and flight missions was based upon plaintiff’s training records, including counseling reports, grade sheets and other documentary material submitted by Ms academic and flight instructors.
(b) Plaintiff did not object to any of the testimony presented by Captain Konieczka; however, the latter was cross-examined at length by plaintiff who testified in his own behalf. Plaintiff particularly disputed testimony given by *736 Captain Konieczka with respect to counseling sessions lie bad with plaintiff and allegations to the effect that plaintiff had been given a “military reprimand”; that he had not applied himself and that he had been inattentive in class. However, plaintiff did not contest the accuracy of his student training records, and simply attempted to excuse, justify and rationalize his academic and flying failure and deficiencies.
(c) Plaintiff testified to the effect that the main reason he failed to make satisfactory progress in his academic studies was because he missed classes in order to receive treatments for a sinus condition that developed in December 1955. He testified that his sinus trouble and certain medicines prescribed therefor adversely affected his flying ability and accounted for some of the unsatisfactory missions flown by him. Although plaintiff testified that the flight surgeon placed him on “duty status not involving flying” (DNIF— see footnote 9 to finding 14(b), supra) on some occasions, the records do not disclose that the flight surgeon considered it necessary to place plaintiff on such status on occasions that he allegedly administered, or prescribed, drugs for plaintiff. Nor is there any evidence of record that prior to the hearing plaintiff requested that he be placed on DNIF status, or complained that this was not done. On the basis of plaintiff’s own testimony, only three of the twelve unsatisfactory flight missions performed by plaintiff were due to his sinus condition.
(d) Ground training at Ellington Air Force Base was in three areas, i.e., navigation, electronics and military leadership, and the record of the Board proceedings disclose that plaintiff was deficient in all three of said areas to some degree. While it is not entirely clear from the record, it appears that plaintiff did seek counseling with respect to academic electronic class problems during the time he was in Class 56-14A; but it does not appear that he did so while a member of Class 56-20A, or that he sought extra assistance in his navigation subjects while attending either of said classes. Plaintiff was frequently absent from academic, electronics, and military leadership classes, not only because of the numerous visits he made to the flight surgeon’s office, *737 but also because of several extracurricular activities, duties and responsibilities that he voluntarily assumed, e.g., plaintiff was the student squadron member of the Board of Governors of the Officer Club and made surveys from time to time that resulted in his being absent from classes; he served as income tax consultant and representative to other students which necessitated his leaving the post to discuss matters with representatives of the Internal Revenue Service in the city. As a result of plaintiff’s many absences from classes and failure to achieve adequate proficiency in his academic courses, he had difficulties in the air.
(e) On the basis of the report of the Ellington Board proceeding, including documentary material either formally introduced in evidence or properly before the Board, it is concluded that the findings and recommendations of the Board are factually supported, fair, reasonable and justified.
17. Prior to the closing of the open session of the hearing, plaintiff was asked by the Board if he had any other statement to make, to which question plaintiff responded: “The only statement is that I believe I can fly DR by multiple drift and ground speed by timing, and I believe I can get through the program.” It appears that immediately after plaintiff made the above statement, he was excused from the hearing room and the Board went into a closed session. The non-voting Recorder remained in the hearing room ivith the Board during its closed session deliberations; but he did not vote. At the conclusion of the closed session, plaintiff was recalled to the hearing room and advised by the President of the Board as follows:
PRESIDENT: Lt. Henderson, the Eacuity Board, after careful consideration, is recommending your elimination from training. We feel that you have failed the course for factors over which you had no control. We think your attitude was acceptable and that you just do not have the background for your electronics work and did not get a good enough grasp of fundamental DR.
Plaintiff did not complain that the Recorder had remained in the hearing room during the closed session of the Board.
18. On May 17, 1956, the Ellington Faculty Board made the following findings and recommendations:

*738
FINDINGS:

* * *
1. Lt Henderson did receive extra help in bis electronics, but did not seek extra help in bis navigation subjects.
2. Lt Henderson’s academic grades were adversely effected by bis frequent absences from class due to visits to tbe flight surgeon. However, he was held over once and given rechecks in subjects that he failed, and still failed to demonstrate proficiency in flying, as evidenced by his failure of several flight missions with Class 56-20.
3. Lt Henderson’s sinus trouble did adversely effect his work in the air. However, the Board feels that his failure to demonstrate proficiency in this area was mainly due to lack of his knowledge of DE fundamentals.
This officer’s elimination was not a result of factors over which he had control.

RECOMMENDATIONS:

It is recommended by the Faculty Board that Lt Henderson be eliminated from the Primary Basic Observer Cadet Training Program due to Flying Deficiency.
Lt Henderson is not eligible for further aircrew training.
There are no recommendations for improving the quality of training.
19. On May 31, 1956, the Ellington Faculty Board’s findings and recommendations were approved by Col. Norman L. Callish, USAF, the Base Commander, who was both the convening authority and the reviewing authority. He was not a member of the Board which plaintiff met. The record does not disclose the nature of the review accorded the Board proceedings by the base commander prior to the time he approved the Board proceedings, i.e., whether, he reviewed the proceedings in accordance with the provisions of AFE 53-15, as amended May 15, 1956;[21] he did or did not interpret said regulation as requiring him to “review for legal sufficiency”; reviewed the proceedings for legal sufficiency himself; or submitted the report of the proceedings “to the staff judge advocate for review as to legal sufficiency” in ac *739 cordance with AFB 11-1, dated December 29, 1953[22] before final review action was taken by him. While the record indicates that some personnel connected with the Board proceedings were not aware of the newly issued AFB 53-15, dated May 15, 1956, supra, in the absence of proof to the contrary, it cannot be affirmatively found that the base commander was unaware of said regulation or that he failed to properly interpret and comply with the provisions thereof, before approving the proceedings.
20. Prior to the approval of the Ellington Board’s findings and recommendations, plaintiff, by letter dated May 25,1956, advised the Air Adjutant General, Washington, D.C., that he had submitted his resignation from the Virginia Air National Guard, and expected to be released from active duty and training status at Ellington AFB shortly. Plaintiff also advised said official that for business and family reasons it was imperative that he reside in the Los Angeles, California, area, and plaintiff requested that his records be changed to indicate his new home-of-record as Laguna Beach, California. In this connection, plaintiff stated that there was no appreciable difference in mileage from Ellington AFB, Texas, to Laguna Beach, California, than from Ellington to Arlington, Virginia, the place from which he had entered on active duty for training.
21. By Special Orders No. 109, dated June 5, 1956, plaintiff was advised that having been eliminated from Aircraft Observer Training at Ellington AFB, effective May 31,1956, he was being released from that station; and plaintiff was directed to proceed, on June 8, 1956, to Arlington, Virginia, his home-of-record, so as to arrive there on June 12, 1956, on which date he would be relieved from active duty training. The record does not reflect that at that time plaintiff made any protest against his being released from active Federal service.
22. (a) Plaintiff filed an application, dated October 10, 1958, together with a brief in support thereof attached thereto, with the Air Force Board for Correction of Military Bec-ords which related to the Graham Faculty Board proceedings. Plaintiff stated in the application, inter alia, that he *740 had been, released from active duty training at Graham Air Force Base, Florida, on May 4,1955; that his present status was “reserve”; that he did not desire to personally appear before the Board, or to have witnesses do so in support of his application; and that he would not be represented by counsel. The brief attached to the application refers to the Graham Faculty Board proceedings in question, and it contains seven principal specifications of alleged errors and extensive arguments in support thereof, relating to the composition and actions of the Board, the conduct of the proceedings, and the approval of the Board’s findings and recommendations.[23] In the concluding paragraph of the brief, plaintiff requested that he “be reinstated in flight training, the Board [Graham] proceedings be stricken from the [his] record, all pay and allowances accrued be paid, and appropriate promotion credit be extended.”
(b) In an undated addendum to his (first) application of October 10,1958, supra, plaintiff set forth from memory the following information concerning military flights allegedly made by him for which he claimed entitlement to compensation :
To Type A/C & Time Date (apprx) From
8June 55. Boeing Field, Seattle, ‘Wash. Westover AFB, 1\fl" occ; KC-97 (aprx 16 hrs).
9 June 55____. Westover AFB_ McQuire AFB, N.J. R4D (aprxl hr).
1 July 55. Byrd Field (Sands-ton, Va.). Syracuse, N.Y_ DC-6Bmil chtr (aprx 5 hrs).
7 July 55. Syracuse, N.Y_ Local___ B-26 (aprx 3 hrs).
10 July 55. Syracuse, N.Y_ Local-B-26 (aprx 3 hrs).
17 July 55. Andrews AFB, Md_ Wright-Patterson AFB. C-47 (aprx 5 hrs).
18 July 55_. Wr ight-P atter s on. L.A. Inti, CaliL_ C-47 (aprx 16 hrs)
20 July 55_ L.A. Int’l. Travis AFB_ B-25 (aprx 4 hrs).
23 July 55.. McClellan AFB__._ McChord AFB. C-45 (aprx8 hrs).
For the months of August and September 1955:
August 28_ Ellington AFB Scott AFB_. B-25 (aprx7hrs).
August 29_ Scott AFB_ Bolling AFB— B-25 (aprx 6 hrs).
September 1___ Bolling AFB._. Maxwell AFB. C-47 (aprx8 hrs).
September 2_ Maxwell AFB. Kelly AFB--. C-54 (aprx 6 hrs).
There is no evidence of record that plaintiff actually performed the above-mentioned flights; that he performed aircraft duties on any of said flights; nor that he was a rated officer or a flying student, or was on any kind of flying status, on any of the dates shown with respect to such flights.
*741 (c) Plaintiff filed another application, dated October 27, 1958, together with a brief in support thereof attached thereto, with the Correction Board, which related to the Ellington Faculty Board proceedings. Plaintiff stated in the application, inter alia, that he was released from active duty training at Ellington Air Force Base, Texas, on June 12, 1956, and gave the same answers to other questions which are identical to those set forth in his first application of October 10, 1955, supra. The brief attached to the second application contains six specifications of alleged errors and extensive arguments in support thereof, relating to the composition and actions of the Board, the conduct of the proceedings, and the approval of the Board’s findings and recommendations.[24] The brief concludes with the same request for relief set forth in plaintiff’s first application of October 10, 1958, supra.
(d) No additional evidence was submitted to the Correction Board by plaintiff in connection with either his application of October 10, 1958 or the one dated October 27, 1958.
23. (a) Plaintiff’s two applications for correction of his military records were treated by the Correction Board under one docket (No. 59-069). It appears that both applications, together with the supporting briefs and addendum attached thereto, and plaintiff’s pertinent military records, were referred to, and reviewed by, the Office of the Judge Advocate General of the U.S. Air Force.
(b) In a letter dated January 6, 1959, the Director of Administrative Services was advised by the Director of Civil Law, Office of the Judge Advocate General, that his office had previously reviewed the Graham and Ellington Faculty Board proceedings in light of plaintiff’s applications and briefs and had found both proceedings legally sufficient. He further advised that no information had been added to plaintiff’s file to change that view.
(c) Thereafter, the Correction Board denied both of plaintiff’s applications for correction of his military records and it is reasonably concluded that the Board’s action was *742 taken in reliance upon the legal opinion rendered by the Office of the Judge Advocate General.
(d) Subsequently, on March 11,1959, the Executive Secretary of the Board sent a letter to plaintiff advising that the record failed “to establish a showing of probable error or injustice”. It appears that plaintiff did not receive that letter until several weeks later. In a letter dated April 13, 1959, plaintiff requested the Board to furnish him with a copy of its findings, decisions, and recommendations, and that he be allowed to inspect the record of the Board’s proceedings. In response to that letter, plaintiff was advised under date of April 22, 1959, that the Board had met in executive session to determine whether (1) to authorize a formal hearing, (2) to recommend to the Secretary of the Air Force that the [plaintiff’s] records be corrected without further hearing, or (3) the application should be denied on the basis that the Board determined that insufficient evidence had been presented to indicate probable error or injustice. Plaintiff was further advised that a record of proceedings was prepared only in those instances in which the Board took action in the categories (1) and (2), supra. A copy of the Board’s letter of March 11, 1959, supra, was forwarded to plaintiff and he was further informed that in the event he had new and material evidence not previously considered by the Board, he could submit such evidence for further consideration and review.
24. In a letter dated April 29,1959, plaintiff replied to the Board’s letter of April 22, 1959, and asserted that he understood the Board’s position to be that the legal contentions made by plaintiff in his briefs were not sufficient to state a cause of action cognizable before the Correction Board. Generally, plaintiff reiterated his argument that the Faculty Boards were improperly constituted and void ab initio. In response to that letter, the Executive Secretary of the Board sent a letter to plaintiff under date of May 28, 1959, which reads in pertinent part:
Faculty Board Proceedings are purely, administrative in nature, are governed by administrative regulations and not derivative from Statute. The sole purpose of *743 a Faculty Board is to determine tbe facts and make recommendations to tbe conveying authority who may be, and in your [plaintiff’s] case was, the approving authority.
The Board finds that the Faculty Boards in your case were conducted in substantial compliance with the applicable regulations and there were no errors of procedure so prejudicial as to justify voiding the proceedings. Moreover, on the whole of the case the Board finds no error or injustice which warrants corrective action by the Board.
Plaintiff replied to that letter on December 27,1960, and suggested that on the basis of Vitarelli v. Seaton, 359 U.S. 535, decided on June 1, 1959, the record should be corrected without a hearing or, alternatively, that there be a rehearing. In response to that letter, the Board sent a letter to plaintiff, dated February 13,1961, which reads :
The Board has carefully considered your letter of 27 December 1960, concerning a request for a rehearing in your case and it is the conclusion of the Board that the matters presented by you provide insufficient basis for further review of your case.
25. The status which plaintiff held in the Air Force Reserve and the manner in which such status was acquired by him, subsequent to his release from active duty training on June 12,1956, is not ascertainable from the record. However, it is clear that plaintiff did have a commissioned status in the Air Force Reserve after his release from active duty on said date. By direction of the President, pursuant to Reserve Orders No. B-01514, dated March 9, 1961, plaintiff was relieved from assignment and honorably discharged from all appointments in the United States Air Force, effective March 8,1961. Said orders were issued under the authority of paragraph 22a (1) of AFR 45-41 relating to discharge from a commission by reason of failure for selection for promotion.
26. On May 4,1961, plaintiff filed his petition herein which contains, inter alia, three counts. In the prayer for judgment contained in plaintiff’s petition, he indicates that Counts one and two relate to his claim for basic pay, including flight pay, and allowances for the period May 5, 1955 to September 4, 1955, and, in connection therewith, plaintiff states “Petitioner *744 admits defendant United States as [sic] a set-off eqnal to petitioner’s base pay and allowances for a period of 15 days.” The record contains no further reference to any such “set-off” by either plaintiff or defendant.
27. As set forth hereinbefore (finding 5(a), supra), the Graham Faculty Board met on April 26,1955. The pertinent provisions of AFR 53-15, dated June 30, 1953, as amended August 18,1954, which latter version was amended by Change A, dated December 28,1954 and Change A, dated March 31, 1955, applicable to the Graham Faculty Board proceedings (see findings 4 to 7, inclusive, supra), are quoted below:
1. Purpose and Scope. This Regulation prescribes the general provisions governing USAF schools. This Regulation applies to all maj or air commands in the zone of interior and overseas.
*
5. Responsibility:
a. Headquarters USAF. Headquarters USAF will formulate general plans and policies and exercise general supervision over USAF schools.
b. Major Air Commands. Commanders of major air commands will prepare appropriate training programs, detailed plans and policies, and will operate USAF schools under their jurisdiction.
:|: * * * *
6. Commandant. Commanders of major air commands concerned or delegated subcommanders will appoint a commandant of each USAF school under their jurisdiction. The commandant will have direct supervision of the school and will be responsible for all matters of instruction and administration therein.
7. Faculty Board:
a. Appointment. Commanders of major air commands concerned, or such officer or officers as they may designate, will appoint a faculty board at each ÜSAF school, to meet at the direction of the school commandant.
b. Fu/nction. The faculty 'board will determine all matters relating to proficiency, deficiency, graduation, and elimination of students. It will also determine such other matters regarding the school as may be referred to it by the school commandant. The faculty board will include with each copy of the report of board proceedings a completed copy of DD Form 785, “Record of Dis-enrollment From Officer Candidate-Type Training,” *745 for each student disenrolled or eliminated from the school.
8. Faculty Board Proceedings:
a. [Approval] : The major air commander concerned or such officer or officers as he may designate will approve or disapprove faculty board proceedings. In no instance will any member of a faculty board approve or disapprove faculty board proceedings. The approving authority will review each faculty board proceeding for completeness, standardization, and clarity. It will make sure that faculty board recommendations are adequately substantiated. Qualified training personnel at command level, not lower than the responsible Air Force headquarters, will review all faculty board proceedings on officers, cadets, National Guard, and MDAP students.
b. Elimination for Factors Over Which Student Has Oiontrol. A determination will be made on whether elimination was caused by factors over which the student had control. If elimination can reasonably be traced to such factors, findings to this effect will be included in faculty board proceedings.
c. Distribution:
(1) One copy of approved faculty board proceedings on all officer students eliminated from the course of training will be forwarded by separate cover to the student officer’s immediate commander for his information and any action considered appropriate (see paragraph 2c (6), AFR 86-2, 12 February 1954).[25]
$ * $ # «
9. Termination of Student Status. The following criteria will govern the termination of student status of students assigned to TTSAF schools:
a. Each student will be informed from time to time whether his work is satisfactory or unsatisfactory. In the latter instance, he will be suitably and privately advised by the commandant or appropriate staff member. * * * % *
c. This paragraph will not be construed as depriving a commander of a major air command of his prerogatives as outlined in the Uniform Code of Military Justice. In cases involving the termination of student status of students for disciplinary reasons, the use of the faculty board and/or its proceedings will be at the discretion of the commander of the major air command concerned. *746 In cases involving the death or erroneous enrollment of a student, the commandant may take the necessary action without reference to the faculty board.
d. Upon approval of the faculty board proceedings as specified in paragraph 8a, the commandant of the USAF school concerned will terminate the student status of the student.
:fi ‡ ‡ ‡
28. As set forth hereinbefore (see finding 11 and footnote 7), the orders appointing the Ellington Board which met on May 17, 1956, were issued May 16, 1956. On May 15, 1956, AFR 53-15, as amended through March 31, 1955 (quoted in pertinent part in finding 27, supra), was superseded by a completely revised regulation. The pertinent provisions of the new AFR 53-15, dated May 15, 1956, applicable to the Ellington Faculty Board proceedings are quoted below:
sf: # # #
5. Commandant. Commanders of major air commands concerned or delegated subordinate commanders will appoint a commandant of each USAF school under their jurisdiction. The commandant will supervise the school and will be responsible for all matters of instruction and administration.
6. Faculty Board:
a. Appointment. Commanders of major air commands concerned, or the officer (s) they designate, will appoint a faculty board at each USAF school, to meet at the direction of the school commandant.
b. Function. The faculty board will consider all matters concerning proficiency, deficiency, graduation, and elimination of students from a course of training. It also will consider other matters referred to it by the school commandant.
c. Board Procedure:
(1) The appointing authority will determine the procedure of the faculty boards under his jurisdiction within the scope of applicable Air Force regulations. AFR 11-1 contains guidance and will apply, except as indicated in (2) below. The faculty board of schools which conduct officer candidate-type training will include with each copy of the report of board proceedings a completed copy of DD Form 785, Record of Disenrollment from Officer Candidate-Type Training, for each student dis- *747 enrolled or eliminated from a course of training leading to a commission. The board will determine whether elimination was caused by factors over which the student had control. If elimination reasonably can be traced to such factors, these findings will be included in faculty board proceedings.
(2) Specifically exempted from the review requirement of paragraph 17, AFR 11-1, 29 December 1953, are proceedings of faculty boards convened to consider:
(b) Proceedings involving academic deficiency, flying deficiency, and related matters in which the action of the board will not jeopardize the commission, grade, rating, or military status of the respondent or furnish the basis for possible elimination (separation from the service) or
(c) Demotion proceedings against the respondent.
(3) Proceedings of faculty boards which are to be forwarded for or used as the basis of further administrative action (for example, see paragraph 2c(6), AFR 36-2, 12 February 1954)[26] or which inquire into the conduct, efficiency, fitness or pecuniary liability of the student as a member of the Air Force will require the application of all procedures prescribed by AFR 11-1.
d. Approval. The commander of the major air command concerned or the officer(s) he designates, will approve or disapprove all faculty board proceedings. The appointing authority may be designated as approving authority, except that in cases involving a student who is a rated officer undergoing flying training, the approving authority shall be not lower than Training Air Force headquarters. In such cases the appointing authority will recommend approval or disapproval of the faculty board proceedings. The appointing authority will review each faculty board proceeding for completeness, standardization, clarity, and, unless otherwise provided in this regulation, for legal sufficiency (paragraph 17, AFR 11-1).[27] The appointing authority will insure that faculty board findings and recommendations are adequately substantiated. In no case will a member of the faculty board approve or disapprove the faculty board proceedings. Qualified personnel at command *748 level, not lower than the responsible Air Force headquarters, will review all faculty board proceedings on officers, aviation cadets, officer candidates, aviation students, students from the Air National Guard, students from the Air National Guard of the United States, and Air Force Reserve who are enrolled from their Reserve status; and foreign students.
•]* $
7. Termination of Student Status. The following criteria will govern the termination of student status of personnel assigned to USAF schools:
a. Each student will be informed from time to time whether his work is satisfactory or not. If unsatisfactory, he will be suitably and privately counseled by the commandant or appropriate staff member.
b. Any time the faculty board of a USAF school decides that a student, for any reason, is unfit to continue his course of training, the school commandant immediately will suspend the student from training.
c.When faculty board proceedings recommending elimination of the student from a course of training are approved, the commandant of the school concerned will terminate the student status of the individual concerned.
!{• $ $ $ $
29. The pertinent provisions of Flying Training Air Force (FTAF) Manual 51-4, issued October 1955, by Headquarters, Flying Training Air Force, Waco, Texas, which manual was applicable to the Ellington, but not the Graham, Faculty Board proceedings, are set forth below:
Foreword
1. Purpose and Scope. This Manual prescribes the policies, procedures, and instructions governing elimination, graduation, and reassignment of students undergoing flying training. This Manual applies to students who are undergoing flying training.
2. Contents. This Manual will be published in three parts. Part one pertains to the functions of Faculty Boards. Part two contains policies and administrative procedures pertaining to elimination Faculty Boards. Part three pertains to graduation administrative procedures.
*749 Part 0ns
Faculty Boards
Section I

General

1. Purpose. Part I of this manual outlines the appointment, composition, and functions of Faculty-Boards.
2. Definitions.
a. “Flying Training” — Any formal course of undergraduate or graduate pilot or aircraft observer training.
b. “Elimination” — The formal relief of a student from flying training by the Elimination Faculty Board and approval by the Beviewing Authority.
c. “Effective Date of Elimination” — The date the Be-viewing Authority approves the faculty board proceedings.
d. “Holdover” — A student who, in the opinion of the Training Group Commander or such officer as he may designate, is unable to continue training with his class and is assigned for training with a subsequent class.
Section II

Appointment amd Composition of the Faculty* Board

3. A Faculty Board will be appointed at each Air Force base of this Command under the provisions of AF Begulation 53-15. The board will be composed of the following members:
a. Wing Executive Officer.
b. Training Group Commander.
c. Training Group Executive Officer.
d. Wing Operations and Training Officer.
e. Training Group Operations and Training Officer.
f. Chief of the Training Analysis and Development Division or TA&D Coordinator, as applicable (nonvoting, if civilian).
g. Foreign Administrative Officer, if applicable (nonvoting) .
h. Base Security Officer or Air Police Officer when security material is being considered (non-voting).
i. Becorder (commissioned or warrant officer — nonvoting) .
*750 j. Not more than two additional members with appropriate specialty rating, if required to insure representation on the board of the specialty for which the student is being trained.
4. A Faculty Board will be appointed at each Civilian Contract School. The board will be composed of the following members:
a. Military Operations Officer.
b. Director of Military Training.
c. One or more Military Check Pilots.
d. One or more Military Training Officers.
e. Civilian Contractor or his authorized representative (non-voting).
f. TA&D Coordinator (non-voting, if civilian).
g. Base Security Officer or Air Police Officer if security material is being considered (non-voting).
h. Foreign Administrative Officer if applicable (nonvoting) .
i. Recorder (commissioned or warrant officer — nonvoting) .
5. The senior rated member of the Faculty Board appointed in accordance with paragraph 3 or 4 above, will be the president of the board.
6. Members of Faculty Boards appointed at stations conducting courses for rated students will possess qualifications identical to those required for members of a Flying Evaluation Board.
7. A quorum of three voting members must be present. This includes one member current in the specialty for which the student is being trained.
8. The officer who recommended that a student be considered for elimination and whose signatures appear in Section I and II, FTAF Form 91, will not sit as members of the Faculty Board.
9. The general functions of the Faculty Board are:
a. To review all matters relating to the proficiency, deficiency, graduation, and elimination of each individual student referred to the board and to recommend whether the student—
(1) Should be allowed to continue training with his present class.
(2) Should be held over to a subsequent class for additional instruction.
(3) Should be eliminated from the course of instruction in which he is enrolled.
(4) Is qualified to graduate from the course of instruction in which he has been undergoing training.
*751 b. To determine the predominant canse or reason for the student’s inability and/or unsuitability for continuing in training in the event he is recommended for elimination. This predominant cause or reason may or may not be the same as the reason which brought about the student’s appearance before the Faculty Board. This will depend upon the facts brought out during the course of the board proceedings.
c. To determine whether or not a student recommended for elimination should be allowed to re-enter the same course of instruction at a later date.
d. To determine whether or not a student recommended for elimination should be considered for further aircrew training for which he is qualified at the time of application.
e. To determine whether or not a student recommended for elimination should be considered for further officer training for which he is qualified at the time of application.
f. To determine such other matters regarding the school as may be referred to it by the School Commandant.
10. Faculty Boards convened solely for determining matters related to the proficiency, deficiency and elimination of students will not be subject to review by a Staff Judge Advocate under the provisions of AF Regulation 11-1. Any requirement for inquiry into the proper discharge of a student’s legal or moral responsibilities as a member of the USAF will be referred for action before a court-martial or appropriate board. Such action will then be subject to review in accordance with the UMCJ or AF Regulation 11-1.
Past Two
ELIMINATION Administrative Procedures for Flying Training Schools
Section I

Purpose

11. This part outlines the administrative procedures necessary to effect relief of personnel from flying training courses. In the event any provisions of this part of the manual are in conflict with directives governing foreign students, the specific directives governing foreign students will take precedence.
*752 Section II

Cmises for Elimination of Personnel from Training

12. Faculty Board action is required in all cases where a student is found to be deficient in training and further training is not considered economical or when a student is withdrawn from training for administrative, reasons. Faculty Board action is not required for fatality cases. The following reasons, substantiated by documentary evidence when necessary, are the only causes for which a student may be relieved from training:
a. Flying Deficiency.
b. Academic Deficiency.
*****
d. Physical Deficiency. * * *
Section III

Action Prior to Convening of the Faculty Board

14. The case of any student who is considered ineligible to continue training will be reviewed. The reviewing officer will recommend one of the following:
a. Retention in present class and course.
b. Retention in present course and holdover to a subsequent class.
c. Appearance before the elimination Faculty Board.
*****
Section IY

Manner of Action and Procedure of the Elimination Eacuity Board

19. The Faculty Board is not a punitive body and board action will not be used for disciplinary purposes. All pertinent evidence will be reviewed, with a view toward protecting the rights of the individual.
20. The proceedings will be conducted in a dignified manner, and the dignity of the student will be respected at all times. The student will be advised the name and duty assignment of each member of the board.
21. Recommendations of the Faculty Board will be based on information brought out during the proceedings. In addition to the recommendations required by *753 Part I, Section III of tbis Manual, the following will be included:
a. Recommendations concerning the student’s elimination from training.
b. Recommendations concerning Flying Evaluation Board action if the student is rated (See AF Regulation 36-57[28] for appropriateness of FEB action).
c. To insure consistency of action as outlined in Letter AFPMP, Headquarters USAF, subject “AFROTC Graduates Who Fail to Enter Flying Training,” 9 November 1954, the following items will be included in the findings and recommendations:
(1) Officer (was) (was not) commissioned and called to active duty for the sole purpose of entering flying training.
(2) Elimination (was) (was hot) self-initiated and (was) (was not) a result of factor over which the student had control.
d. Recommendations for improving the quality of the training program.
22. The Faculty Board will substantiate any case wherein a student is qualified but not recommended for reinstatement and/or other training leading to a commission and/or aeronautical rating.
23. Students who are being considered for relief from training will be required to appear in person before the board, if physically capable of doing so, and to testify on matters pertaining to their progress in training. If a student does not appear before the board, the reason will be indicated in the board proceedings.
Section V

Preparation and Distribution of Elimination Faculty Board Preceedings and Records

24. Proceedings and records of the Elimination Faculty Board will consist of the following:
a. FTAF Form 91 as the title page.
b. An extract copy of the special orders appointing the Faculty Board.
* ❖ * %
d. Minutes of the Elimination Faculty Board meeting in all cases, completed to include findings and recommendations of the board. When a student is eliminated because of circumstances beyond his control and the *754 board does not recommend reinstatement and/or flying-training, a brief statement validating tbe nonrecom-mendation will be included in tbe minutes. _ The minutes will also include information which establishes the identity of the officer who recommended the student for Faculty Board action.
e. Orders effecting transfer * * * suspension from flying- status or separation from the service, when applicable.
f. A copy of student’s FTAF Form 157, “Student Record — Flying- Training”, properly completed and such other records of training as deemed appropriate. Item 28, FTAF Form 157, will indicate the recommendations of the Faculty Board relative to further training leading to a commission and/or aeronautical rating. When students are being eliminated for Flying Deficiency from pilot training, a copy of the final check ride grade slip will also be attached. The total number of previous landings, progress checks and failing grades will be shown in the remarks section.
}|i ‡ íjs $ ‡
j. One copy of FTAF Form 110, “Notification of Board Hearing,” for each copy of the Elimination Faculty Board Proceedings.
■Ü * * * *
1. ATO Form 98, “Abstract of Faculty Board Proceedings.” This form will be prepared in duplicate by the School Secretary for each student eliminated from Primary, Basic, or Advanced Pilot or Aircraft Observer Training. The original copy of this form will be attached to the copy of the board proceedings forwarded to this Headquarters. This form will be prepared as completely as possible for students who are training fatalities. The original copy of the form for training- fatalities will be forwarded to this Headquarters, Attention: Student Personnel, by letter of transmittal. The duplicate copy of ATC Form 98 in all cases will be forwarded by letter as soon as possible to Headquarters, AF Personnel and Training Research Center, Attention: Personnel Research Laboratory, Lackland Air Force Base, Tesas. * * *
$ $ * # *
27. Approval of Elimination Faculty Board Proceedings.
*755 a. Action by the Convening Authority. The date and action taken by the Convening Authority will be indicated on each copy of the Title Page.
b. Action by the Reviewing Authority. All Wing and Contract School Commanders are delegated authority to render final action on all board proceedings except as follows:
(1) Cases involving violation of Flying Regulations.
(2) Aviation cadets and aviation students who marry or who are found to be married.
(3) Cases where a rated officer is being eliminated from Advanced or Specialized Training and Flying Evaluation Board action is not recommended.
Any case on which the Convening Authority does not desire to render final action may be forwarded to this Headquarters for review. The letter of transmittal will indicate the reason final action by this Headquarters is deemed appropriate. Board proceedings submitted for approval by this Headquarters will be in duplicate for USAF students and quadruplicate for foreign students.
28. Distribution of Elimination Board Proceedings. The board proceedings for each student eliminated will be prepared in sufficient copies to effect the following distribution as applicable:
a. Original copy forwarded to this Headquarters by letter of transmittal.
‡ $ $ $ $
d. An additional copy for eliminees who were in training under an Air National Guard quota forwarded to Chief, National Guard Bureau, Attention: Air Personnel Branch.
* $ $ $ $
g. An additional copy for all students eliminated from training at Graham Air Base and for all students eliminated from Basic Training who completed Primary Training at Graham Air Base. * * *
Section VI

Action Subsequent to Elimination

30. Flying Evaluation Board Action. When appropriate and recommended, * * * rated officers will be required to meet a Flying Evaluation Board immediately subsequent to elimination.
*756 31. Action Under AF Regulation 36-2[29] for SIE AFROTC Officers. If an officer commissioned for the sole purpose of entering flying training fails to complete the course of training for reasons over which he had control, he will be considered for action under provisions of AF Regulation 36-2. (See paragraph 8c(l), AFR 53-15, and paragraph 2c(6), AFR 36-2.)
Hi ❖ ❖ H* %
30. (a) The pertinent provisions of Air Force Regulation 11-1, dated December 29, 1953, entitled “Administrative Practices — Boards of Officers for Conducting Investigations”, are set forth below:
1. Purpose and Scope. This Regulation prescribes the procedures generally applicable to the conduct of investigations by boards of officers. It applies to all Air Force activities.
2. Authority. A commander possesses inherent authority to order a board of officers to investigate a matter within his command jurisdiction whether or not specific regulations exist covering the subject matter involved. Usually, however, boards of officers are appointed -under specific Air Force Regulations. These instructions are supplemental to such regulations. In case of conflict, the specific Regulation under which the board is appointed will govern. When the specific Regulation is silent on a matter covered herein, the provisions of this Regulation will apply. When no specific Regulation provides for the institution of an investigation, a responsible commander may initiate the investigation under the provisions of this Regulation.
3. Functions and Duties. The primary function of a board is to ascertain and report facts so that the appointing authority may have adequate information on which to base his decision. The primary duty of a board is to develop and consider the evidence concerning the matter under investigation, to arrive at clear, consistent findings and, where required, to make recommendations.
a. The functions and duties of investigating boards are purely administrative, not judicial.
* * * t- *
4. Appointment. Orders appointing a board will specify the matter to be investigated, the action to be taken by the board, and the scope of the findings re *757 quired. If convened under a specific Air Force Regulation, tbe Regulation will be cited; if convened for a purpose not specifically covered by Regulations, tbe purpose must be stated in sufficient detail to apprise tbe board thereof.
* * * & t-
d. Botb commissioned and warrant officers may be appointed as members. Board members entitled to vote will be senior to any person under investigation; and tbis requirement may not be waived by tbe respondent.
‡ ‡ ‡
g. Wben tbe number of voting members required to constitute either a board or quorum is specified in tbe appointing order or in pertinent law or regulations, no lesser number will constitute tbe quorum required to be present at all sessions. Wben tbe number of voting members required to constitute a board is not specified in tbe pertinent law or regulations, a board of not less than three voting members will be appointed and a majority of voting members so appointed, but never less than three, will constitute a quorum.
6. Notification to Persons Concerned:
a. In every case in which the conduct, efficiency, fitness, or pecuniary liability of any person is to be investigated, the recorder will, at a reasonable time in advance of tbe convening of the board, deliver or dispatch to tbe person concerned a written communication, stating:
(1) Time and place of tbe convening of tbe board.
(2) Specific allegations or questions to be investi-Sated, in sufficient detail to enable tbe person to answer. reneralized statements will not be used, except, as required for the protection of classified information under existing security regulations or directives.
(3)Names of tbe witnesses to be called by tbe board.
(4)That the board will endeavor to arrange for the presence of military witnesses requested by the individual, provided that:
(a)Timely request therefor is received.
(b)The request can reasonably be complied with,
(c)The witnesses can present material evidence, and id) Tbe witnesses are reasonably available.
(5)Wben applicable, that tbe person is entitled to be represented by available counsel of his own choice. (See paragraph 8.)
*758 (6) That if it is impossible for the respondent to appear before the board at the time and place fixed, he may request another date or meeting place; and that, if such request is reasonable, is received without delay, is based upon valid grounds, and the requested action is practicable, a new date and place of hearing will be arranged.
*****
b. A copy of the written communication required in a above, together with any reply thereto, will be entered in the record as an exhibit.
‡ ‡
8. Persons Entitled to Counsel:
a. Unless the law or a specific regulation so provides, a person under investigation is not entitled to counsel as a matter of right.
•b. An individual will be afforded the privilege of military counsel of his own choosing, if reasonably available, or civilian counsel at his own expense, and he may request that military counsel be assigned in any proceeding which may fairly be regarded as:
(1) Subjecting him to possible criminal prosecution, or disciplinary or corrective administrative action;
(2) Jeopardizing a commission, rating, grade, or status;
(3) Furnishing cause for possible elimination or demotion proceedings against him; or
(4) Imposing pecuniary liability upon him.
H* »!• «!» «N
9. Evidence. The investigation by the board should be so conducted that the best evidence obtainable and available may be considered. Boards are enjoined to require evidence, wherever possible, which tends to fix dates, places, persons, and events definitely and accurately. Usually, a board’s investigation is resolved into an inquiry concerning a few essential facts. These facts should be established by evidence of sufficient weight to be convincing.
a. The board should not be satisfied until all reasonably available evidence has been examined, such as:
(1) Sworn testmony by witnesses appearing before the board.
(2) Depositions.
(3) Certificates of officers and affidavits of enlisted personnel and civilians.
(4) Original or properly authenticated true copies of records and documents.
*759 (5) Other writings and exhibits.
* í|í #
b. A hoard is not hound hy the formal rules of evidence prescribed for trials hy courts-martial. However, general observance of the essence of t!he following rules will promote orderly procedure and increase the probability of a full, fair, and impartial investigation. [Emphasis supplied]
* * * * *
(3) Hearsay rules (paragraph 139, MCM 1951, page Ml).
$ $ $ $ $
10. Hearings. During its hearings the board should adhere to an orderly and semiformal procedure. Informal conversation or comments, statements “off the record,” and reference to extraneous matters should be avoided.
a. A person whose conduct, efficiency, fitness, or pecuniary liability is under investigation will be extended the privilege of counsel, as provided in paragraph 8, will be permitted to be present at all open sessions of the board, to cross examine witnesses appearing against him, and to call witnesses and present evidence in his own behalf. * * *
% if: i*:
e. Depositions, certificates, affidavits, and stipulations may be received and considered by the board in cases where it is impracticable or impossible for a witness to appear personally. * * *
f. The board is authorized to dispense with formal proof of the authenticity of documents provided that it is satisfied that a document is what it purports to be, and it is impracticable to produce a witness to identify the document. * * *
g. The respondent or his counsel may, at any time during the proceedings, submit a written brief covering the whole or any phase of the matter under investigation.
$ ‡ ‡
13. Findings. The findings recorded will be the substance of the facts material to the issue as established by the evidence. In resolving disputed and conflicting evidence, the members of the board should use their professional knowledge and their best judgment and common sense in weighing the evidence, considering the probability or improbability thereof, and selecting that *760 evidence considered most worthy of belief. Each finding must, however, be supported by evidence of record. In determining the facts, the board may make reasonable inferences based on the evidence, but must avoid conjecture. A finding should be made on each point in question before the board. Each finding should be stated separately in concise and unambiguous language, including specific dates, places, and events.
14. Recommendations. When required by law, regulation, or the order of appointment, the board will make recommendations. Recommendations must be appropriate to and consistent with the findings as well as consonant with applicable laws, regulations, policies, and customs of the service, with due consideration for the best interests of the Government and the person concerned.
‡ ‡ *
16. Preparation of Reports of Proceedings. The recorder wifi be responsible for the proper preparation of the report. * * * Whenever a verbatim transcript of the testimony is appropriate, the convening authority may furnish a reporter, if available.
17. Action on Completed Proceedings. In all cases covered in paragraph 6a, after the report of proceedings has been processed for final action, it will be submitted to the staff judge advocate for review as to legal sufficiency before such final action is taken by each commander required by law or regulation to act thereon.
(b) With respect to 9b(3) of AFR 11-1, supra, it is clear from a reading of paragraph 139 of Chapter XXVII, entitled “Rules of Evidence”, Manual for Courts-Martial (1951), that the rules set forth therein (including the “Hearsay Rule”, paragraph 139, p. 247), “are applicable in cases before courts-martial * * *”, and not to investigations conducted by a faculty, or other administrative boards.
31. (a) Under date of April 22, 1954, Col. Joel B. Olmsted, USAF, the Staff Judge Advocate at Headquarters, Air Training Command, Scott Air Force Base, Illinois, submitted to the Judge Advocate General of the United States Air Force, Headquarters, USAF, Washington, D.C., a letter which reads in pertinent part:
1. Submitted herewith is a request for an interpretation of the applicability of paragraph 17, AFR 11-1[30] *761 to Faculty Board Proceedings convened under provisions of AFR 53-15.[31] Faculty Boards are appointed in accordance with paragraph 7a, AFR 53-15, which provides :
“Commanders of major air commands concerned or such officer or officers as they may designate, may appoint a _ Faculty Board of each USAF school to meet at the direction of the school Commandant.”
This appointing authority has been delegated to the three Training Air Forces of this Command * * * with power of redelegation. The Training Air Forces have delegated this authority to Wing Commanders and Commanding Officers of Contract Flying Schools. The function of Faculty Boards is defined in paragraph 7b, AFR 53-15 as follows:
“The Faculty Board will determine all matters pertaining to the efficiency, deficiency, graduation and elimination of students and such other matters regarding the school as may be referred to it by the school Commandant.”
Under the above regulations Faculty Boards are appointed by Wing Commanders and Commanding Officers of Contract Flying Schools to consider any matters referred to the Board that relate to the general operation of the USAF school. In the past a substantial majority of the cases that were processed by Faculty Boards in this Command concerned questions of flying deficiency, academic deficiency, self-initiated requests for elimination and related cases. The balance of the cases before the Board involved the student’s military conduct as distinguished from his flying or academic efficiency in the USAF school.
_2. A question has been presented to this Headquarters with respect to the applicability of paragraph 17, AFR 11-1 to Faculty Board Proceedings operating as outlined in paragraph 1 above. Paragraph 17 reads as follows:
“In all cases covered in paragraph 6a, after the report of proceedings has been processed for final action, it will be submitted to the Staff Judge Advocate of the convening authority for review as to legal sufficiency before such final action is taken by each Commander required by law or regulation to act thereon.”
*762 In spelling out which cases must be examined by the Staff Judge Advocate prior to final action, paragraph 6a, AFR 11-1 in pertinent part states:
“In every case in which the conduct, efficiency, fitness ot yeeumary liability of any person is to be investigated. * * *” (Underscoring supplied) Paragraph 8’b (l)-(4) inclusive, AFR 11-1 further defines the above underlined words as follows:
“8. Persons Entitled to Counsel:
* * # * *
b. An individual will be afforded the privilege of military counsel of his own choosing, if reasonably available, or civilian counsel at his own expense, and he may request that military counsel be assigned in any proceeding which may fairly be regarded as:
(1) Subjecting him to possible criminal prosecution, or disciplinary or corrective administrative action;
(2) Jeopardizing a commission, rating, grade, or status;
(3) Furnishing cause for possible elimination or demotion proceedings against him; or
(4) Imposing pecuniary liability upon him.” Paragraphs 6a and 8b above, AFR 11-1 appear to be primarily concerned with investigations that are quasi punitive in nature and which may adversely affect a person’s military status in the USAF. It is significant to note that paragraph 8a, AFR 11-1 provides that a person under investigation is not entitled to counsel as a right unless the subject matter set out in paragraphs 6a and 8b are the basis for the inquiry. This implies that Boards of Officers may properly convene to investigate subjects that are not included in the categories defined by paragraph 6a; AFR 11-1.
3. In accordance with the foregoing, it is the opinion of this Headquarters that Faculty Boards convened to consider a student’s flying deficiency, academic deficiency, self-initiated request for elimination and related cases are not the type of proceeding contemplated by paragraph 6a, AFR 11-1, and hence do not require a review by a Staff Judge Advocate prior to the taking of final action. Faculty Boards are utilized in this fashion as devices to identity those students who are unable to successfully complete the prescribed course of instruction in a USAF school. When a Faculty Board is required to inquire into a student’s military conduct or the proper discharge of his legal and moral responsibilities as a member of the USAF as defined by paragraphs 6a and *763 8b, AFR 11-1 m/m, then paragraph 17 is believed to be entirely applicable.
4. It is requested that this Headquarters be advised of the applicability of paragraph 17, AFR 11-1, Faculty Board Proceedings that are convened to consider cases involving flying deficiency, academic deficiency, * * *.
('b) In response to the above letter (opinion and inquiry), the Acting Director of Civil Law, Office of the Judge Advocate General, Headquarters, USAF, replied that USAF Headquarters “concurs in the opinion expressed in paragraph 3, basic letter” (letter dated April 22,1954, swpra.)
(c) It is apparent from the above that insofar as the United States Air Force was concerned, under AFR 53-15 (finding 27) which was applicable and controlling with respect to the Graham Faculty Board proceedings, faculty boards convened to consider, inter alia, a student’s flying deficiency, academic deficiency * * * and related cases were not the types of proceedings contemplated by paragraph 6a, AFR 11-1, supra, and, therefore, did not require a review by the staff judge advocate prior to the taking of final action. This view was subsequently adopted by the promulgation of FTAF Manual 51-4 in October 1955 (see paragraph 10 thereof, finding 29, supra.)
32. Air Force Regulation 36-2, dated February 12, 1954, as amended by AFR 36-2A, dated July 27,1954, and by AFR 36-2B, dated December 9, 1954,[32] was not offered in evidence and is not physically a part of the record herein; however, the Commissioner obtained a copy of said regulation and took judicial notice of it. That regulation, relating to officer personnel, “prescribes the criteria and procedures for effecting the elimination, demotion, or release [of commissioned officer] from active duty for reasons of unacceptable conduct or efficiency * * *.” Tire policy that regulation attempts to effect is to eliminate “substandard or marginal officers.” The regulation is not considered applicable or controlling in this proceeding, because plaintiff was never eliminated, demoted or released from active duty “by reason of conduct or efficiency”, but rather he was eliminated from active duty for *764 training (pilot and aircrew) for “flying deficiency”. Note of tbe regulation is taken because reference thereto is made in paragraph. 6c(3) of ARE 53-15, dated May 15,1956 (finding 28, sufra), and shows the distinction in administrative treatment of officers whose performance of duty as officers is inefficient or substandard, as compared with the administrative treatment of officers undergoing training who are merely unqualified to continue the particular training program in question. That latter problem is separate from their performance of duties as an officer. In the event the question were whether an officer was unqualified to continue as an officer and unqualified to continue training, it would appear that action usually would be taken pursuant to AFR 36-2, rather than, e.g., under the provisions of AFR 53-15, dated May 15, 1956, supra, relating to actions of faculty boards.
33. (a) Air Force Regulation 36-57, dated September 10, 1954, as amended by AFR 36-57A, dated August 15, 1955, relating to “Officer Personnel — Flying Status of Bated Personnel” (Emphasis supplied), reads in pertinent part:
1. Purpose and Scope. This Regulation prescribes the policies and procedures by which rated personnel are placed or suspended from flying status. This Regulation applies to all Air Force commissioned officers, including members of Reserve components of the Air Force who are not serving on extended active duty. * * *
12. Local Flying Evaluation Boards:
$ $ ‡ &
b. Composition. * * *
(2) A recorder will be present throughout all proceedings.
(3) A medical member will be present throughout all proceedings concerning medical disqualification or when otherwise requested 'by the convening authority or the president of the board.[33]
*765 (4) Three rated voting officers will constitute a quorum.
(5) Voting members will be senior to the officer being evaluated.
(6) All voting members will be rated officers. Flight surgeons and aviation medical examiners will serve as advisers to the board and will not be voting members.
(7) When practicable, one voting member will hold a rating in the specialty of the officer being evaluated.
% % Hi ❖ &
d. Proceedings. Flying evaluation board proceedings will be conducted in accordance with AFR 11-1. A report of the board proceedings will be prepared * * * and signed by all convened board members, both voting and nonvoting. * * *
(b) It is emphasized that the above-mentioned regulation relates to the flying status of “Rated Personnel”; and is not applicable to the instant proceedings because plaintiff never achieved a rated flying status.
34. Plaintiff cites paragraph 6 of Air Force Regulation 36-35, as stating that “Board members must be serving on active duty in a higher grade than the officer being considered [for demotion or release] * * * and must be senior in permanent 'grade.” The designation “AFR 36-35” was originally used in defining a regulation dated July 6, 1950, which concerns “assignment of Regular officers to duty with the Reserve Forces”, and it does not contain a paragraph “6”, or a paragraph containing the above quote. That regulation (of July 6,1950) was superseded by AFM 35-11, dated January 1,1955, which concerns the same subject; so neither of the two regulations are relevant to this case. As a result of the issuance of the latter regulation (AFM 35-11), numerical designation 36-35 again became available for use; and it was used in the issuance of AFR 36-35, dated July 23,1957, which superseded Section D of AFR 36-2, dated February 12,1954. The latter regulation (as noted in finding 32, supra), was amended by AFR 36-2A, dated July 27,1954, and AFR 36-2B, dated December 9, 1954. Section D of AFR 36-2, as amended, did not contain a paragraph 6 (or any other paragraph) providing for a board of officers and no changes were made therein throughout the years 1955, 1956, and until *766 November 1957. Accordingly, it is apparent from the foregoing that AFE 36-2, dated February 12, 1954, as amended in July and December 1954, remained in full force and effect until November 1957. In any event, as indicated in finding 32, sufra, that regulation (AFE 36-2, as amended) is not applicable to the faculty board proceedings such as the ones in question in this action. As best it can be determined, the paragraph 6 of AFE 36-35 cited by plaintiff is paragraph 6 of AFE 36-35, dated July 23, 1957, which does contain the quote in question. However, the latter regulation was not applicable to the Graham and Ellington Board proceedings because both of them occurred before the date of that regulation.
35. The pertinent provisions of Air Force Eegulation 35-6, dated February 3, 1953, as amended by AFE 35-6A, dated March 3, 1953, and supplement thereto dated October 16, 1953, and AFE 35-6B, dated July 27,1954, is a general regulation entitled “Discharge of Officers and Airmen From Air Force Eeserve”, are quoted below:
1. Purpose and Scope: To prescribe the criteria and procedures for effecting the discharge from the Air Force Eeserve of officers and airmen not serving in the active military service.
2. Policy:
a. General. The Eeserve components of the Air Force are maintained to provide available trained units and qualified individuals for active duty in time of war or national emergency, and at such other times as the national security may require, to meet the requirements of the Air Force until additional trained units and qualified individuals necessary for the achievement of planned mobilization may be obtained through procurement and training programs. Membership in the Air Force Ee-serve carries with it the responsibility of return to active military service in the event of mobilization or emergency, or at such other times as the national security may require. * * * Those individuals who are not qualified or who are unable to properly discharge this responsibility will be discharged from the Air Force Eeserve in accordance with the criteria outlined in this Eegulation. No person has an inherent right to continued service in the Air Force Eeserve. Such service is a privilege which may be terminated when that action is determined *767 to 'be in. the best interests of the Air Force. An officer by virtue of bis appointment 'has a responsibility for leadership which requires exemplary conduct and effective performance of duty at all times. Probationary officers in particular should be subjected to the closest scrutiny during their trial period to assure that their qualifications and actions justify their retention.
b. Identification of the Unfit. Commanders at all echelons will assure prompt identification of reservists whose conduct or efficiency is or has been such as to raise doubt as to their fitness for retention. When identified, positive action to rehabilitate or eliminate them will be initiated.
«i» *i» sfs
16. Actions by Boards of Inquiry:
❖ * # * #
f. As soon as practicable, after the close of the hearing, the voting board members will meet in executive session to mate their findings and recommendations. The recorder will attend but will not vote.
# H* % ❖ *
Paragraph 16f (quoted above), was changed by the July 27, 1954, amendment to read as follows:
As soon as practicable, after the close of the hearing, the voting board members will meet in executive session to make their findings and recommendations. Any recommendation for discharge will also contain a recommendation as to character of discharge which should be awarded, that is, honorable, “under honorable conditions,” or under other than honorable conditions. The findings and recommendation of the board will be announced to the respondent by the senior member as soon as they are decided upon.
It is apparent from a reading of this regulation, as amended, that it is not applicable or relevant to the type of proceedings (i.e., Graham and Ellington Faculty Boards) involved in this case.[34]
*768 36. Air Force Regulation 35-16, dated June 16, 1954, is a general regulation which sets forth the purpose and scope, composition and functions of the “Secretary of Air Force Personnel Council” (and Responsibilities of the Director and Deputy Director of the Council). In brief, the Council “is an administrative activity established by the Secretary of the Air Force for the purpose of recommending to and announcing for the Secretary of the Air Force, action under applicable statutes and regulations.”[35]
CONCLUSIONS OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover on that part of his claim pertaining to the period subsequent to September 4, 1955, and the petition is dismissed to that extent. Plaintiff is entitled to recover on that part of his monetary claim for accrued basic pay, including flying pay and allowances, to which he would have been entitled during the period from May 4,1955 to September 4,1955, inclusive, less any proper set-offs that defendant may have; and judgment is entered to that effect with the case remanded to the Trial Commissioner under Rule 47(c), for further proceedings consistent with this opinion.

The opinion, findings of fact and recommended conclusions of law are submitted pursuant to Buie 45(a) (since April 1, 1964 Eule 57(a)) and the order of reference dated April 8, 1963, as supplemented by order dated April 12, 1963.

 See finding 26, infra, which states, in substance, that plaintiff admits defendant is entitled to a set-off equal to plaintiff’s base pay and allowances for a period of 15 days. It would appear that sucb “set-off” relates to the period May 5, 1955, to September 4, 1955, inclusive, but the record does not contain any further reference to this matter.

 In brief summary, tbe substance of plaintiff’s contentions are: (1) that the order appointing the Board was too old, that it did not specify the matter to be investigated, and that it was non-specific in failing to identify the Board members by name, rank and serial number; (2) that the membership of the Board did not conform to appointing order, or appropriate law and regulation, in that (a) First Lieutenant James P. McAdams, a voting member of the Board, was merely a “military training officer”, rather thaD the “Senior Military Training Officer” specified in the appointing order dated August 14, 1953 (finding 5(a), infra), and that, therefore, the presence of McAdams on the Board was unlawful; and (b) (i) that 2d Lt. John L. Krill, a voting member of the Board, could not have been the “military check pilot” referred to in said appointing order, ibid,., because Lt. Krill was first commissioned on October 13, 1954 (finding 5(c), infra), (ii) that Krill was junior in rank to plaintiff and that, therefore, the Board did not meet the quorum requirement that it be comprised of a minimum of three eligible members; (3) that 2d Lt. Krill became an adverse witness by reason of the fact that during the Board hearing, he offered in evidence the “Progress Check” report which was submitted by an Air Foret check pilot under date of April 21, 1955 (see finding 3, infra) ; (4) that the presence, during the closed session of the Board, of the recorder and another non-voting member of the Board was prejudicial to his *699 rights; (6) that some of the evidence -was improperly received and considered by the Board because it was of a hearsay nature, and that the quantum of such evidence, particularly the “Progress Check” report, prejudiced his rights; (6) that he was denied effective “appellate review” of the Graham Board proceedings because (a) the review was made by a regular, rather than a reserve, officer who acted both as the convening authority and the reviewing authority, and (b) the report of the Board’s proceedings were not submitted to the “staff judge advocate for review as to legal proficiency * * *”, in accordance with the directives contained in paragraph 17 of APR 11-1, dated December 29, 1953 (see finding 30, infra), before final action was taken by the commander; and (7) that he did not have sufficient notice of the Graham Board proceedings in that he was notified thereof less than 24 hours in advance. Inasmuch as certain of the foregoing contentions, i.e., those summarized above in (4), (5) and (6), are repeated among the complaints plaintiff leveled at the Ellington Faculty Board proceedings and raise substantially the same legal problems, they are discussed in detail under the section of this opinion which deals with the latter Board.

 See finding 30, infra, for other pertinent provisions of this regulation.

 Amendments material to tlie Graham Board proceedings include AFR 53-15, dated August 18, 1954 (which superseded an earlier amendment dated May 6, 1954), Change A dated December 28, 1954, and another Change also designated “A”, dated March 31, 1955. The pertinent provisions of AFR 53 — 15, as so amended, are set forth in finding 27, infra. See footnote 3 to finding 5(a), infra. Also see finding 28, infra, for pertinent provisions of a completely new version of AFR 53-15 which was issued May 15, 1956, and was applicable to the Ellington Board proceedings.

These particular complaints are briefly summarized in contentions numbered 4, 5 and 6 in footnote 2, supra.

 Pertinent provisions of this regulation are set forth in finding 35, infra.

 See finding 32, infra, for comments concerning this regulation.

 The “T” score relates to a system of grading that was then used in the united States Air Force, and it is fully explained in footnote 13 to finding 15(a), infra.

 The report actually does not reflect whether those twelve unsatisfactory grades related to ground academics or to plaintiff’s flight performances. Presumably they related to plaintiff’s flight performances.

 See finding 27, infra, for pertinent excerpts from AFR 53-15, which, as amended through March 31, 1955, was in effect at the time the Graham Faculty Board met. Subsequent to the Graham Faculty Board hearing on April 26, 195,5, AFR 53-15, as amended prior to that date, was modified, in its entirety, by an amendment dated May 15, 1956. (See footnote 7 and finding 28, infra).

 See finding 22, infra, for details concerning this application, the relief desired, and the manner in which plaintiff requested his military records relating to the Graham Faculty Board proceedings be corrected.

 Plaintiff actually commenced training in the 3606th Aircraft Observer Training Squadron. The reason for such change does not specifically appear. Apparently, it was merely administrative.

 Such action is more commonly known in flying or observer training as a “wash-back”. “Remake” refers to the student’s opportunity to retake an academic test or a flight mission check (FMC) after a sub-standard performance. AG refers to the academic course of study then known as Alternating Current which was the second of five phases of electronic training in airborne trouble-shooting of radar and loran equipment.

 As noted in findings 27 and 28, infra, AFR 53-15, dated June 30, 1953, was amended on August 18 and December 28, 1954, March 31, 1955, and May 15, 1956, the day preceding the issuance of the order dated May 16, 1956, appointing the Ellington Faculty Board which plaintiff met on May 17, 1956. The May 15, 1956, version of AFR 53-15 was completely new and modified the original regulation as previously amended, in its entirety. Finding 27, infra, sets forth pertinent excerpts from such regulation as it read with the amendments that had been made through March 31, 1955 (which regulation, as amended through the latter date, was applicable to the Graham Faculty Board proceedings). Finding 28, infra, sets forth pertinent excerpts from AFR 53 — 15 as it read after the amendment of May 15, 1956 (which was applicable to the *731 Ellington Faculty Board proceedings). It should be noted that paragraph 6(c) of the new AFR 53-15, as amended May 15, 1956, as opposed to the old version of said regulation, appears to require that faculty board proceedings of the nature involved in the Ellington Faculty Board be reviewed for “legal sufficiency”. The record in this case does not disclose whether personnel at Ellington AFB received the amended regulation (of May 15,1956) either before the Ellington Board was appointed, or before the convening authority and reviewing authority (same individual) approved that Board's recommendations. In any event, said appointing Letter Order No. 137 does not specifically mention the May 15, 1956, amendment.

 The pertinent parts of FTAF Manual 51-4, applicable to the Ellington (but not the Graham) Faculty Board proceedings, are set forth in finding 29, infra»

 Refers to plaintiff being assigned to Duty Not Involving Plying.

 Apparently refers to the dates on which plaintiff was returned to normal duties including flying duties.

 See Defendant’s Exhibit 6, pp. 25-26.

 See Defendant’s Exhibit 6, pp. 27 — 49 inch

 The grades appearing in parenthesis reflect plaintiff’s grades the second time through those particular areas of study. Grades reflected are “T” score grades. The “T” score system was a system of grading then in use in the U.S. Air Force. It was used generally in many training schools and more particularly in flying training schools. Grades under the “T” score system ranged from a minimum of 20 to a maximum of 80. Other percentage or raw score grades were converted to “T” scores as necessary. A “T” score less than *735 35 was a failing grade. The interpretation of “T” scores is as follows: 66 or over — comprising highest 6% of all the students; 55 to 65 — above average, comprising 26%%; 46 to 54 — average, comprising 35%; 35, to 45 — below average, comprising 26%%; and 34 or below — comprising the lowest 5% (of all the students).

 See footnote 11 to finding 15(a), supra.

 This stands for “Dead Reckoning aided by Multiple Drift and Ground Speed by Timing.”

 The use of the word unknown indicates that it is not known whether or not the particular mission was flown or the grade thereof, if flown.

 Plaintiff's sinus problem contributed to the unsatisfactory performance.

 Passing was a raw score of 51. Plaintiff’s raw score was 39. Plaintiff lost 13 procedure points due to a conflict in instruction.

 A defective piece of equipment contributed to the unsatisfactory performance, l.e., plaintiff’s computer; which is a piece of equipment Issued to the student for his use during the entire training period and for which the student is responsible; and it is not a part of an aircraft’s equipment, e.g., a compass or radio.

 This letter was received in evidence during the hearing as Exhibit “C”, without objection of plaintiff on the grounds that it contained hearsay, or on any other grounds. (See Defendant’s Exhibit 6, page 57.)

 See, particularly, sub-paragraphs c(2) and d of paragraph 6 of this regulation (finding 28, infra).

 See paragraph 17 of this regulation (finding 30, infra).

 See Defendant’s Exhibit No. 7, pp. 38 to 6Í, inclusive.

 See Defendant’s Exhibit No. 7, pp. 14 to 37, inclusive.

 Comments concerning this regulation, as amended through December 9, 1954, are set forth in finding 32, infra.

 See finding 32 infra, for comments concerning this regulation, as amended December 9, 1954 (a date prior to the issuance of this new version of AFR 53-15).

 See finding 30, infra.

 See finding 33, infra.

 See finding 32, infra.

 See finding 33, supra.

 All references to AER 53-15 In this letter are to the version thereof set forth in finding 27, supra. Paragraph 7(a) thereof is substantially the same as paragraph 6(a) of the May 15, 1956 version of this regulation, set forth in finding 28, supra.

 As noted in finding 34, infra, ail of these regulations were superseded by APR 36-35, dated July 23,1957.

 On page 17 of plaintiff’s brief attached to the application dated October 27, 1958 (Defendant’s Exhibit 7), relating to the Ellington Board proceedings, submitted to the Air Force Board for Correction of Military Records, he refers to, and purports to quote from, paragaph 16(d) of AFR 36-57. This appears to be an incorrect reference. As best it can be determined from the record, plaintiff meant to refer to paragraph 12b(3) of AFR 36-57, as amended August 15, 1955. In any event, the latter provision was the one applicable to the Ellington Board proceedings.

 This finding, quoting pertinent parts of the regulation, as it read originally, and as amended, is made primarily because reference is made to paragraph 16f thereof, as amended July 27,1954, in an opinion of The Judge Advocate General of the Air Force (“Op JAGAF 1956/9”) dated February 14, 1956, which plaintiff cited in the briefs attached to the two applications he submitted for correction of his military records, in support of his contentions that the presence of the recorder (and the reporter) during the closed sessions of both the Graham and Ellington Faculty Board hearings was prejudicial to him and rendered these proceedings nugatory.

 This regulation does not appear to be relevant, but it is mentioned because of references thereto in the record.